UNITED STATES of America

v.

Henry J. CIANFRANI.

Crim. No. 77–412.

United States District Court,
E. D. Pennsylvania.

March 27, 1978.

Gregory T. Magarity, Frank Sherman, Philadelphia, Pa., for the government.

Nicholas J. Nastasi, Philadelphia, Pa., for defendant.

Donald L. Weinberg, Arthur E. Newbold, IV, John R. McConnell, Philadelphia, Pa., for intervenors.

## OPINION

### EDWARD R. BECKER, District Judge.

#### I. *Preliminary Statement*

This opinion[1] addresses the question whether a hearing on a defendant's motion to suppress as evidence the tapes of intercepted oral or wire communications and on a corresponding Government motion to authenticate those recordings for use at trial must, at the request of the defendant, be held *in camera* or, conversely, whether the public and the news media are entitled to access to that hearing and/or to the transcript and record thereof. Principally at issue are the tapes of certain conversations between defendant, Henry J. Cianfrani, and one Vera Domenico. These conversations were recorded by special agents of the Federal Bureau of Investigation, allegedly with the consent of Miss Domenico. One conversation was recorded by virtue of Miss Domenico's premises being "wired"; the balance were telephone conversations conducted over "tapped" telephones. If these recordings were in fact made with Miss Domenico's consent, they would appear to be within the ambit of 18 U.S.C. § 2511(2)(c), which, as one of the exceptions from the statutory proscription against the interception of wire and oral communications, *see generally* 18 U.S.C. §§ 2510–2520, authorizes interception of a communication when one of the parties to the communication gives prior consent to its interception.

The defendant has contended that Miss Domenico did not give a valid consent to the interception and that the tapes and transcripts thereof must therefore be suppressed as evidence obtained in violation of law. He has thus moved to suppress the evidence under 18 U.S.C. § 2518(10).

The Government, on the other hand, has moved, pursuant to the procedure set forth in *United States v. Starks*, 515 F.2d 112, 121 n.11 (3d Cir. 1975), for the authentication of the tapes so that they may be introduced into evidence at trial.[2] The hearing the openness of which is at issue is also therefore intended as a *Starks* hearing.

The parties to the controversy now before us are the defendant, who has asked that the hearing be held *in camera*, and an impressive array of members of the Fourth Estate, who have asked that it be open. This array consists of Philadelphia Newspapers, Inc. (The Philadelphia Inquirer and the Philadelphia Daily News), the Philadelphia Bulletin Company, the Associated Press, the Columbia Broadcasting System, and the Westinghouse Broadcasting Company. Recognizing the First Amendment interest of the news media in this issue, we have granted the media leave to intervene on the media access question. The United States Attorney has taken no position in the matter, leaving it "to the discretion of the Court."

---

1. This opinion consists of the consolidation of an edited version of a bench opinion, originally delivered on November 16, 1977, and a Memorandum Sur Motion for Reconsideration, originally filed November 21, 1977. The order issued pursuant to this opinion was reversed by the United States Court of Appeals for the Third Circuit on March 16, 1978, Nos. 77–2445 & 77–2462. Because of the landmark importance of the Third Circuit's opinion, we think it important for the bench, bar, legal scholars, and interested citizens to be able to read and consider the Third Circuit's opinion in its fullest possible context. In order to help provide this background, we have edited and published, although at this late date, our previously delivered opinion.

2. Footnote 11 of *Starks* provides:

A review of the authorities leads to the conclusion that, before a sound recording is admitted into evidence, a foundation must be established by showing the following facts:

(1) That the recording device was capable of taking the conversation now offered in evidence.

(2) That the operator of the device was competent to operate the device.

(3) That the recording is authentic and correct.

(4) That changes, additions or deletions have not been made in the recording.

(5) That the recording had been preserved in a manner that is shown to the court.

(6) That the speakers are identified.

(7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

*United States v. McKeever*, 169 F.Supp. 426, 430 (S.D.N.Y.1958).

On Friday, November 11, 1977, one of the media representatives called our chambers to inform us that she desired to be heard through counsel if any of the pretrial hearings that had been scheduled pursuant to prior order of this court were to be held *in camera.* These hearings were originally scheduled to commence on Tuesday, November 15. On November 14, we informed the media that we would permit their counsel to present oral argument with respect to their right of access to the hearing. On November 15, we held lengthy oral argument at which media counsel and defense counsel were heard on the issues.

Defense counsel argued that the hearing must be held *in camera* for several reasons: (1) the tapes were grand jury material which are barred from public scrutiny under Federal Rule of Criminal Procedure 6(e); (2) the wide publication of the tapes that could be expected were the hearing open to the public might infringe defendant's Sixth Amendment right to a fair trial; (3) in any event, the press is not entitled to access to a pretrial hearing, as opposed to the actual trial itself; and (4) the suppression procedures established by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, do not countenance public or media presence at suppression or *Starks* hearings.

The media countered with the argument that a pretrial suppression/authentication hearing is an integral part of the trial and that, in any event, as a judicial proceeding taking place before a United States Judge in the United States Courthouse it must presumptively be open to the public and the press. The media further argued that, on the record made in this case, the defendant had not met the burden for restricting the press' First Amendment rights imposed on him by the United States Supreme Court's landmark decision, *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

*Nebraska Press* involved the murder of six persons in a small community in Nebraska. To prevent prejudicial pretrial publicity, the district court of Lincoln County, Nebraska issued an order that, as modified by the Nebraska Supreme Court in original mandamus proceedings instituted by the news media, restrained the media from publishing or broadcasting accounts of confessions or admissions made by the accused or of facts strongly implicating him. This order was to remain in effect only until the jury was impaneled and sequestered. On *certiorari,* the United States Supreme Court, in an opinion by Chief Justice Burger that expressed the views of five members of the Court, reversed.

The Supreme Court held in *Nebraska Press* that the challenged order violated the First Amendment's guarantee of free press insofar as the record did not demonstrate that alternatives to a prior restraint on the news media would not sufficiently have mitigated the adverse effects of pretrial publicity so as to make a prior restraint unnecessary. Further, the Court said that it was unable to conclude that the record showed that the restraining order would even have served its intended purpose. The Court also held that the order prohibiting reports or commentary on judicial proceedings held in public was clearly invalid and that, to the extent to which the order prohibited publication based on information gained from other sources, the heavy burden imposed as a condition of validly securing a prior restraint was not met.

We observe that in *Nebraska Press* the pretrial hearings conducted by the Court were open and that the court's challenged order prohibited reporting what the media had already heard. *Nebraska Press* thus does not squarely address the precise question now before us, which is that of media access to the proceedings and not that of prior restraint *per se.* The narrow question whether to exclude the press from a Title III suppression or *Starks* hearing has perforce arisen before in this and other federal courthouses throughout the land and has been dealt with by federal judges wherever it has arisen on an *ad hoc*—though doubtless a principled—basis. We are, however, unable to find any reported opinion discussing what we find to be the enormously

complex and sophisticated issues involved. The parties themselves have cited us to none.

The principal and most elusive focus of our concern has been upon the nature and scope of the media's newsgathering or access rights in various important judicial proceedings. Needless to say, whether or not the media's exclusion would fit the rubric "prior restraint," if the media has a presumptive right of access to this suppression hearing, the First Amendment issue cuts very differently than if the media does not have such a threshold right. The question yields to no easy and unitary solution given the variegated nature of judicial proceedings, both civil and criminal, which, when parsed, subsume not just pretrial suppression hearings but also such matters as pretrial discovery, settlement conferences, pretrial conferences, *in camera* conferences to determine various claims of privilege, bench conferences during trial, *et alia.*

■ This opinion will address all of the major contentions raised by the parties and some, although not expressly raised, that emanate from our own analysis of the issues. We shall not, however, discuss the defendant's Federal Criminal Rule 6(e) argument except to note that we consider it to be lacking in merit: the fact that tapes that were the product of a continuing Justice Department investigation of Senator Cianfrani were played to the Grand Jury does not, in our view, make them "Grand Jury material" subject to the strictures of Federal Criminal Rule 6(e).

II. *The Media's Newsgathering or Access Right to Court Proceedings: A Statement of the Problem and of a General Rule*

Judicial trials, and particularly criminal trials, have long been grist for the American newsman's mill. From the trial of Aaron Burr in the nascent days of the Republic to the trials of Sacco and Vanzetti, Bruno Hauptmann, Dr. Sam Sheppard, Billy Sol Estes, and the Watergate defendants, the news media have reported the events of causes célèbres in replete detail, and the public has voraciously read those accounts. With respect to press coverage of actual trials, a considerable body of case law has understandably developed focusing on how the courts should handle cases in which excessive or unfair publicity threatens a defendant's Sixth Amendment right to a fair trial and impartial jury. There has been, however, relatively little distinction in the cases between, on the one hand, the media's right to print or broadcast what it knows and, on the other, the media's right to initial access; *i. e.,* its right to newsgathering.

The validity of this distinction was underscored recently in *Herbert v. Lando,* 568 F.2d 974 (2d Cir. 1977), *cert. granted* —— U.S. ——, 98 S.Ct. 1483, 55 L.Ed.2d 515 (1978). Chief Judge Kaufmann there noted that there is a tripartite aspect of the press' work and function, hence of its First Amendment protection: first, acquiring information; second, processing that information; and, third, disseminating information. It is, of course, the first of these—acquiring information—with which we are here concerned.

In the noted case of *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the United States Supreme Court recognized some level of First Amendment protection for newsgathering, but noted that such protection was not absolute in that it did not include protection from enforced disclosure of news sources before a grand jury. *Branzburg* thus made it clear that the newsgathering right was a limited, or at least not unrestrained, one. The Court further noted that there were numerous proceedings from which the press could be excluded. 408 U.S. at 685, 92 S.Ct. 2646. Moreover, it defined the press' right of access to information as coextensive with the access right of the public generally. *Id.* at 686, 92 S.Ct. 2646. Indeed, the *Branzburg* Court was constrained to find the press' access right to be limited in some of its aspects, for in *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the Court had approved limitations imposed by trial courts upon extrajudicial

statements made by counsel in criminal proceedings. Obviously, such limitations on statements of counsel restrict access by the news media to sources of information; they therefore represent one type of permissible abridgment of the news media's access or newsgathering rights. *See also Saxbe v. Washington Post Co.*, 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *see generally The Rights of the Press to Gather Information*, 71 Col.L.Rev. 838 (1971); *The Rights of the Public and the Press to Gather Information*, 87 Harv.L.Rev. 1505 (1974); *News Gathering: Second-Class Right Among First Amendment Freedoms*, 53 Tex.L.Rev. 1440 (1975); *The Right of the Press to Gather Information after Branzburg and Pell*, 124 U.Pa.L.Rev. 166 (1975).

The media have argued in this proceeding that this case is controlled by *Nebraska Press Ass'n v. Stuart,* supra. We note at the outset, however, that the principal issues in this case are not, in our judgment, controlled by *Nebraska Press.* We note particularly footnote 8 of the opinion of the Court and footnote 11 of the concurring opinion of Mr. Justice Brennan, which was joined in by Mr. Justice Stewart and Mr. Justice Marshall. In footnote 8, the Chief Justice stated for the Court:

> Closing of pretrial proceedings with the consent of the defendant when required is also recommended in guidelines that have emerged from various studies. At oral argument petitioners' counsel asserted that judicially imposed restraint on lawyers and others would be subject to challenge as interfering with press rights to news sources. We are not now confronted with such issues.

427 U.S. at 564 n. 8, 96 S.Ct. at 2805 (citations omitted). And, at footnote 11 of his concurrence Justice Brennan stated: "The constitutionality of closing pretrial proceedings under specific conditions is not before us, and is a question on which I would intimate no views." *Id.* at 584 n. 11, 96 S.Ct. at 2814. So, it is clear to us that this case is not directly and necessarily controlled, at least in its right of access aspects, by *Nebraska Press.*

The principal case that most nearly addresses the problem before us is *United States v. Gurney*, 558 F.2d 1202 (5th Cir. 1977). In *Gurney*, newspapers sought review of the orders of the United States District Court for the Middle District of Florida denying their request to examine certain trial documents in a criminal proceeding. The Court of Appeals for the Fifth Circuit held that the members of the media are free to report what occurs in open court, but do not have any First Amendment right of access to those matters not available to the public generally. The Court held that refusal to direct that names and addresses of jurors be publicly released was not an abuse of discretion; that refusal to grant the press access to bench conferences with counsel was not an abuse of discretion; that refusal to grant the press access to exhibits identified but not yet received into evidence was not an abuse of discretion; and that the press had no constitutional right of access to written communications between the judge and the jury. In its discussion, the *Gurney* court noted that the question of the media's First Amendment newsgathering rights in the face of judicial or Government restrictions has been the subject of much discussion but nevertheless remains largely unsettled. 558 F.2d at 1207. In the wake of *Nebraska Press*, it also noted that, as a general rule, orders proscribing publication of matters transpiring in open court are constitutionally infirm absent some compelling justification. But, continued the court, the trial judge in *Gurney* did not resort to the use of prior restraints; the district judge merely refused to allow the appellants to inspect documents not yet a matter of public record. Appellants remained free to obtain whatever information they desired from any source except the district court and its supporting personnel. *Id.* at 1211.

Notwithstanding the rather trenchant language of *Gurney* and its obvious applicability to certain aspects of the access question in this case, we do not find *Gurney* to control here. There are two temporal as-

pects of the access question in this case. The first relates to the hearing itself; *i. e.*, whether the press may be present while the court makes initial authentication/suppression determination. The second aspect relates to the circumstances that will obtain after we have ruled on the suppression and *Starks* motions. More particularly, this second aspect focuses on the question whether, if we grant the *Starks* motion and deny the suppression motion, thus ruling that the tapes were properly obtained and admissible at trial, the public and the media will then have access to the transcripts of the hearing and the evidence introduced therein, including the tapes or transcripts of them. Such a state of affairs would be both similar and dissimilar to *Gurney*. It would be similar in that there would be evidence which, barring sustainable objections on grounds of irrelevancy or prejudice, presumably would be admissible at trial, but which nonetheless would not yet have been introduced into evidence. *Gurney* held that where documents had not yet been introduced into evidence, they were not yet subject to public scrutiny.

However, after the *Starks*/suppression hearing, this case would be dissimilar to *Gurney* in that there would have been a formal adjudicative proceeding before a federal trial judge in a federal courthouse. A most forceful argument can be made that such a situation is distinguishable from *Gurney* on the grounds that what has been the subject of such a formal adjudicative proceeding, as well as the proceeding itself, should be subject to public scrutiny and therefore accessible to the media. Although we can find no binding judicial pronouncement on the point, it seems to us that there should be a strong general presumption in favor of the openness of proceedings conducted by a judge in his courtroom, much like that announced by Mr. Justice Blackmun in his opinion sur re-application for a stay of the Lincoln County District Court order in *Nebraska Press*, 423 U.S. 1327, 96 S.Ct. 251, 46 L.Ed.2d 237 (1975) (in chambers). There Justice Blackmun noted the governing principles that the press is, in general, to be free and unre-strained and that facts are presumed to be in the public domain. 423 U.S. at 1333, 96 S.Ct. 251.

We concur with this presumption and with the observations to this effect made by counsel at argument. This is especially so, it has been argued, where the subject matter of the litigation is a State Senator and the charges involved implicate his stewardship and the public trust. *See Gannett Co. v. DePasquale*, No. 549, 43 N.Y.2d 370, 377, 401 N.Y.S.2d 756, 759, 372 N.E.2d 544, 547 (N.Y.Ct.App.1977), *cert. granted*, —— U.S. ——, 98 S.Ct. 1875, 56 L.Ed.2d 387 (1978). Moreover, although the press did not so argue, Justice Brennan noted in his concurring opinion in *Nebraska Press* that the press has a particular First Amendment interest in suppression proceedings in view of the fact that at issue in such proceedings are the practices of law-enforcement officers in conducting investigations. 427 U.S. at 606–07, 96 S.Ct. 2791. We consider such concerns to be especially compelling when the focus is on law-enforcement use of electronic surveillance. *See generally* Part V, *infra*.

As with most things, however, we cannot decide hard cases by simplistic rules. Indeed, a strict application of the general rule which we have suggested would unleash a Pandora's Box of problems. We consider, for example, pretrial and settlement conferences. The presence of the public or the media at such conferences would be destructive of orderly procedure and, more importantly, would tend to chill the kind of confidential communication and discussion that is essential to the court's important role in the mediation of disputes.

Secondly, we consider the question of pretrial discovery, on which there is already authority in *Times Newspapers Ltd. v. McDonnell Douglas Corp.*, 387 F.Supp. 189 (C.D.Cal.1974). The court there held that the First Amendment does not grant newspaper reporters access to depositions. The court noted that depositions are not a judicial trial nor a part of a trial but a proceeding preliminary to trial; neither the public

nor representatives of the press have the right to be present at such proceedings.

Until a deposition has been presented to the court [not the Clerk] and ordered opened, it does not become evidence in the case, nor has either party until then an opportunity to be heard on the question of competency, materiality, or relevancy of the statements made by the witness, and the public can have no right to know what the testimony is until the court knows what it is.

387 F.Supp. at 197.

Bench conferences comprise another aspect of the judicial process that has been addressed by the courts. In *Gurney*, the Court noted that the press does not have access to such conferences. 558 F.2d at 1210.

Trade secret cases, in which the records of both trial and pretrial proceedings contain evidence of trade secrets, are another important consideration. Consider a case that might occur in the United States District Court for the Northern District of Georgia in Atlanta when a federal judge for some reason ordered the Coca-Cola Company to produce from its safe in the bank vault the formula for Coca-Cola. Might it be contended that because it was produced before a federal trial judge, who held an *in camera* hearing to determine its admissibility and then ruled adversely to admissibility, that the public and the media was entitled to the Coca-Cola recipe? The question is rhetorical and answers itself. It demonstrates that there are privileges and confidentiality or privacy rights to which First Amendment considerations must yield.

Closely related is the question of procedures for determination of various kinds of privileges, including those recognized either at common law or by statute. Frequently, courts are called upon to rule whether the attorney-client privilege, the husband-wife privilege, the physician-patient privilege, or the like is validly asserted. Traditionally, lest the baby be thrown out with the bath water, courts have held such conferences *in camera*. Were courts to proceed otherwise,

public airing of the documents that the court had to scrutinize in order to evaluate a claim of privilege would emasculate the purpose of the privilege claim altogether.

There are thus sound logical bases for some limitations on First Amendment access. Indeed, conceding many of these, media counsel suggested that the appropriate test for media access is whether the court is conducting a formal adjudicative proceeding. The specific question before us, however, is whether a Title III suppression hearing is within the category of those proceedings to which the press has a First Amendment right of access.

The defendant has argued that because the purpose of the suppression and *Starks* hearings is to determine whether the tapes are presumptively admissible, the principle based on privilege determination is applicable here. He argues that to permit public access would, in the event the tapes are held at the hearing to be inadmissible, defeat the entire purposes of the suppression motion because the press and the public, including potential jurors, would have pretrial access to inadmissible evidence.

The question of media access to pretrial proceedings has been addressed by the American Bar Association Project on Minimum Standards for Criminal Justice in its Standards Relating to Fair Trial and Free Press. In the presently extant Rule 3.1, entitled "Pretrial Hearings," the standard reads in pertinent part:

In any pretrial hearing in a criminal case, including a motion to suppress evidence, the defendant may move that all or part of the hearing be held in chambers or otherwise closed to the public on the ground that dissemination of evidence or argument adduced at the hearing may disclose matters that will be inadmissible in evidence at the trial and is therefore likely to interfere with his right to a fair trial by an impartial jury. The motion shall be granted unless the presiding officer determines that there is no substantial likelihood of such interference.

This standard was applied by our colleague Judge Bechtle in *United States v.*

*Frumento,* Crim. No. 75–322 (E.D.Pa. Oct. 20, 1977). In circumstances similar to those before us, Judge Bechtle closed a wiretap suppression hearing to the press after finding that under the ABA standards he was obliged to do so because he could not determine that there was "no substantial likelihood" of interference with the defendant's right to a fair trial. Subsequently, Chief Judge Seitz, of the United States Court of Appeals for the Third Circuit, in a memorandum and order filed as a single judge under No. 75–2182, October 21, 1975, approved the district judge's action and concluded that in view of the prominence of the defendant involved in certain taped conversations and the imminence of trial, he also could not, under the ABA Standards, say that there was no substantial likelihood that disclosure would result in interference with the defendant's right to a fair trial by an impartial jury.

It is apparent that if *Frumento* is still good law in this circuit, the defendant must succeed in his application to close the hearing on fair trial/free press grounds. However, it is our considered view that the original ABA standard cannot and does not survive the Supreme Court decision in *Nebraska Press.* Indeed, in response to *Nebraska Press,* the American Bar Association has now proposed to revise its guidelines and has eliminated the language on which Judge Bechtle and Chief Judge Seitz relied in *Frumento.*

We mention this aspect of the matter here to highlight our rejection of the approach adopted in the ABA guidelines as a solution to the access problem. In our view notions of access and notions of fair trial/free press should not be conceptually intermingled or elided one into the other.[3] Thus, in the context of our case, if the press has a First Amendment right of access to the suppression hearing, then *Nebraska Press* principles apply. Conversely, if the press does not have access, then *Nebraska Press* principles do not control. For this reason we deem inapposite to this case two cases cited by the media, *Hearst Corp. v. Cholakis,* 54 A.D.2d 592, 386 N.Y.S.2d 892 (3d Dep't 1976), and *Gannett Co. v. DePasquale,* 55 A.D.2d 107, 389 N.Y.S.2d 719 (4th Dep't 1976)[4], for they utilized the type of analysis applied in the new ABA standards without first addressing the question whether First Amendment rights and the right to access were coextensive in the context of the particular cases. Needless to say, if the defendant could meet the *Nebraska Press* standard, that would be sufficient for exclusion of the media, irrespective of the answer to the right of access question; however, as will appear, we find that he does not meet that standard in this case.

We turn now to the case law in the suppression area to see if it aids in our determination whether suppression hearings, and particularly Title III suppression hearings, are an exception to the general

---

**3.** Despite this view, we recognize that an alternate approach to the problem exists, and that even after *Nebraska Press* it may it may, under Judge Seitz' decision in *United States v. Frumento,* No. 75–2182 (3d Cir. Oct. 21, 1975), still remain viable to use the ABA standards to allow the access determination and the fair trial/free press balancing to coalesce into a sort of "sliding scale" analysis. This is so because *Nebraska Press* does not itself compel equating denial of access with prior restraint for First Amendment purposes in all cases where the press arguably has some presumptive right of access. Under such an analysis, as the asserted right of access becomes less compelling in a given circumstance, the fair trial/free press balance would begin to shift favorably to a defendant's motion to close pretrial proceedings. Thus, the strict *Nebraska Press* standards would not always be obstacles to a defendant seeking to close particular proceedings. Those standards would be applicable only when a court found the asserted right of access and the First Amendment freedom of the press to be in parity. We note, however, that the amended ABA standards do not reflect such an alternative approach, for they impose a *Nebraska Press* balancing test which justifies media access ban only when *Nebraska Press* would approve a prior restraint.

**4.** Since this opinion was originally delivered from the bench, *Gannett* was reversed by the New York Court of Appeals. *Gannett Co. v. DePasquale,* No. 549, 43 N.Y.2d 370, 401 N.Y. S.2d 756, 372 N.E.2d 544 (N.Y.Ct.App.1977), cert. granted, —— U.S. ——, 98 S.Ct. 1875, 56 L.Ed.2d 387 (1978).

**1110**

presumption-of-access rule. In *United States ex rel. Bennett v. Rundle*, 419 F.2d 599 (3d Cir. 1969), the Third Circuit held that a *Jackson v. Denno* hearing, after jury sequestration, was part of the trial itself to which the defendant's right to a public trial attached. It therefore held that it was error to exclude, over defendant's objection, the public from the suppression hearing. We draw little sustenance from *Bennett*, however, because the hearing took place after trial had begun and the jury was sequestered, because it was the defendant who objected to closing the hearing, and because what were at issue were Sixth Amendment rights, not media rights under the First Amendment. In other words, while concededly there is general language in *Bennett* that might be read to lend some comfort to the media intervenors now before us, it does not address the particular questions involved here.

There are also two FAA secret hijacker profile cases that are of interest. In *United States v. Clark*, 475 F.2d 240 (2d Cir. 1973), exclusion of the defendant and the public from the entire hearing to suppress evidence seized at the airport on the ground that the exclusion was necessary to protect the secret FAA hijacker profile was deemed to be a violation of the Sixth Amendment right to a public trial. In contrast, in *United States v. Bell*, 464 F.2d 667 (2d Cir. 1972), the court held that exclusion of the defendant and the public from limited portions of the suppression hearing, during which description of the hijacker profile was given, was permissible. *See also United States v. Lopez*, 328 F.Supp. 1077, 1087 (E.D.N.Y.1971). (FAA hijacker profile case in which profile information would be disclosed during suppression hearing: "Despite the important rights conferred on both the defendant and the public by the Constitution, exclusion of the public, or portions of it, for limited purposes and for short periods is sometimes justified in the public interest or in the interest of the defendant."). We observe that again in these cases the operative constitutional provision was the Sixth—not the First— Amendment. Nevertheless, in the pretrial

context these courts in the Second Circuit justified closing the suppression hearings by a strong public interest in nondisclosure—a sort of public policy privilege.

In *United States v. De Diego*, 167 U.S. App.D.C. 252, 511 F.2d 818 (1975), the court dealt with a trial court's failure to hold a pretrial evidentiary hearing to determine if certain evidence was the fruit of testimony given under a grant of immunity. Rather than holding the hearing, the trial court had dismissed the indictment against the defendant in part because it felt that holding an evidentiary hearing, necessary to determining the admissibility of the evidence, would lead to prejudicial pretrial publicity. The circuit court reversed, stating:

> The trial judge also stated that a pretrial hearing 'would at best generate additional pretrial publicity of a particularly unfortunate kind.' But the hearing could have been held *in camera* to remove the threat of pretrial publicity. Indeed, such a pretrial taint hearing was held *in camera* by the District Court here in *United States v. Mitchell, et al.* . . . apparently without generating additional pretrial publicity.

167 U.S.App.D.C. at 258, 511 F.2d at 824. Thus, the D.C. Circuit has approved excluding the press from pretrial hearings under certain circumstances to avoid prejudicial pretrial publicity.

Regrettably, no meaningful standards emerge from these cases to guide us. Nor do we find guidance in *In re Washington Post Co.*, No. 76–1695 (4th Cir. July 19, 1976), in which the Fourth Circuit dubbed as a "prior restraint" the action of the district court in closing to public and media access all papers filed in the case after a particular date. That case provides little precedential value in view of the overbroad district court order under review, the absence of any reference to a suppression hearing, and, indeed, the lack of any statement of the reasoning of the court of appeals as to what portions of the record or portions of the matter its one-paragraph order addressed.

The conclusions that we draw from this limited group of cases and from our analysis of the problem before us is that in this context the presumption of media access to the suppression hearing can be overcome only under two circumstances: (1) if the standards of *Nebraska Press* are met; or (2) if some kind of privilege or privacy right surrounds the tapes of the intercepted conversations, thus rendering strict First Amendment analysis inapposite to the access question in this case.

III. *Free Press and Fair Trial: The Legacy of* Nebraska Press Association v. Stuart *and its Applicability Here*

■ We have noted the holding of *Nebraska Press* above and will not rescribe it here. However, the application of the principles announced in that opinion to the facts of that case are instructive. Chief Justice Burger, writing for the Court and applying the announced balancing test, stated that, in order to apply it, he must examine the evidence before the trial judge when the order was entered in order to determine "(a) the nature and extent of pretrial news coverage; (b) whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity; [and] (c) how effectively a restraining order would operate to prevent the threatened danger." 427 U.S. at 562, 96 S.Ct. at 2804. The Chief Justice concluded that that review of the record persuaded him that the trial judge was justified in concluding that there would have been intense and pervasive pretrial publicity concerning the case and that he could also reasonably have concluded, based on common human experience, that that publicity might have impaired the defendant's right to a fair trial. The Chief Justice noted that the trial judge "did not purport to say more for he found only a 'clear and present danger that pretrial publicity *could* impinge upon the defendant's right to a fair trial.' His conclusion as to the impact of such publicity on prospective jurors was of necessity speculative, dealing as he was with factors unknown and unknowable." *Id.* at 563, 96 S.Ct. at 2804.

It is apparent that the record in *Nebraska Press* demonstrated enormously wide and forceful saturation publicity in a small Nebraska county. Nevertheless, with regard to the other considerations articulated in the Court's opinion, the Chief Justice concluded for the Court:

> We cannot say on this record that alternatives to a prior restraint on petitioners would not have sufficiently mitigated the adverse effects of pretrial publicity so as to make prior restraint unnecessary. Nor can we conclude that the restraining order actually entered would serve its intended purpose. Reasonable minds can have few doubts about the gravity of the evil pretrial publicity can work, but the probability that it would do so here was not demonstrated with the degree of certainty our cases on prior restraint require.

427 U.S. at 569, 96 S.Ct. at 2807. Thus, the order of the Nebraska Supreme Court was held invalid as running afoul of the First Amendment. *Id.* at 570, 96 S.Ct. 2791.

We think it appropriate to reiterate at this point that *Nebraska Press* was a prior restraint case in which the material that the judge sought to suppress had already been disclosed to the media in open court. That is not this case; this is an access case, not a prior restraint case. However, insofar as a First Amendment right of access might be presumed under the facts of this case, the standards of *Nebraska Press* would seem to be applicable, for First Amendment considerations would then be implicated in this case no less than they were in *Nebraska Press.*

Assuming, then, that for First Amendment purposes we were to equate in this case denial of access with prior restraint, we think that perhaps the best explication of the teaching of *Nebraska Press* for this case is contained in the newly recommended American Bar Association "Criminal Justice Standards Relating to Fair Trial and Free Press" which, at 3.1, read:

> A judge may not close to the public (including representatives of the news media) any preliminary hearing, bail

hearing, or other pretrial hearing in a criminal case, including a motion to suppress, or seal any document unless the failure to close the proceeding or to seal the document constitutes a clear and present danger to a fair trial in that: (1) There is a substantial likelihood that information prejudicial to the accused's right to a fair trial would reach potential jurors; and

(2) The prejudicial effect of such information on potential jurors cannot be avoided by alternative means. In assessing whether alternative means are available, the court must consider whether the rights of the accused guaranteed by the fifth and sixth amendments can adequately be preserved through: (a) continuance; (b) severance; (c) change of venue; (d) change of venire; (e) voir dire; (f) additional peremptory challenges; (g) sequestration of the jury; (h) admonition to the jury; and (i) other less restrictive procedures.

Turning to the record before us, it is barren of anything but our personal knowledge of the pretrial publicity. There have been no offered clippings, surveys, or anything of the like. Our personal knowledge from reading the Philadelphia dailies, occasionally listening to the radio, and very sporadically viewing television is that there has been extremely widespread publicity of matters affecting Senator Cianfrani. We note too that Newsweek magazine had a full-page story on one aspect of Senator Cianfrani's problems. Indeed, media counsel have conceded that there has been extremely widespread publicity, which augurs for the future that there will continue to be.[5]

While we would have no doubt that in this case Senator Cianfrani could meet the extant (pre-*Nebraska Press*) ABA Standards, it is clear to us that he cannot meet the proposed new Standards. We say, particularly in view of the precise holding of *Nebraska Press*—based upon a fuller rec-

ord than that made here—that the court could not conclude that in the absence of a prior restraint there is a clear and present danger to a fair trial. There are numerous distinctions between this case and *Nebraska Press*. Rather than in a small county, this case arises in a judicial district of 10 counties, some of which, including the counties of Northampton, Schuylkill, Berks, and Lancaster, are far removed from the Philadelphia metropolitan center. Publicity about Senator Cianfrani's problems is likely to be far less there than in Philadelphia, the Senator's home town. Indeed, there are portions of Schuylkill County, for example, where radio and television transmission is extremely poor, at least without a cable. Additionally, there is available to us what we would dub as a Sirica-like voir dire; i. e., a voir dire reminiscent of that conducted by Judge Sirica in the case of the Watergate defendants—an extremely thorough and searching voir dire designed to root out any potential bias or prejudice among jurors. *See United States v. Haldeman,* 181 U.S.App.D.C. 254, 287–293, 559 F.2d 31, 64–70 (1976). There is available to us the avenue of giving Senator Cianfrani additional peremptory challenges to jurors in the event that it should appear from the voir dire that there is potential prejudice. There are also, of course, such measures available as admonition to the jury (which we find that jurors take seriously), the right of sequestration, *et alia.*

We cannot on this record find that failure to close the suppression/*Starks* proceeding or to seal the record of it would constitute a clear and present danger to a fair trial. Although we would concede that there is substantial likelihood that information prejudicial to the accused's right to a fair trial would, if the hearings are held open, be likely to reach potential jurors, we cannot conclude that the prejudicial effect cannot be avoided by the alternative means set forth in the proposed ABA Standards. Therefore, we cannot conclude that this

---

5. Media counsel further suggested to the court that any order denying access would augment rather than diminish that publicity. We do not comment on or take cognizance of that suggestion as it is not germane.

hearing should be closed to the media on what have been described as fair trial/free press grounds.

There now remains for consideration the question whether the communications which are to be the subject of the suppression hearing are attended by a privilege arising out of Title III (18 U.S.C. §§ 2510–2520). If they are, this case would be analogous to cases in which attorney-client and husband-wife privileges or perhaps trade-secrets were involved. In such cases, if the claim of privilege were ultimately sustained, the public and the media would be denied access to the privileged communication not only during the privilege determination itself but also thereafter.

### IV. *Title III and the Right of Privacy: The Legislative Background*

The legislative background of Title III is set forth in House and Senate committee reports, which are noted in the Supreme Court's leading decision of *Gelbard v. United States,* 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972). We note initially an incentive for Title III as explicated by the Senate Judiciary Committee Report.

The tremendous scientific and technological developments that have taken place in the last century have made possible today the widespread use and abuse of electronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized by these techniques of surveillance. Commercial and employer-labor espionage is becoming widespread. It is becoming increasingly difficult to conduct business meetings in private. Trade secrets are betrayed. Labor and management plans are revealed. No longer is it possible, in short, for each man to retreat into his home and be left alone. Every spoken word relating to each man's personal, marital, religious, political, or commercial concerns can be intercepted by an unseen auditor and turned against the speaker to the auditor's advantage.

The Report of the President's Commission on Law Enforcement and Administration of Justice, 'The Challenge of Crime in a Free Society' (1967), concluded that 'the present status of the law (relating to wiretapping and electronic surveillance) is intolerable.' 'It serves,' the Report observed, 'neither the interests of privacy nor of law enforcement.'

S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad.News pp. 2112, 2154. The Senate report goes on to cite the judicial history, including *Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), the famous opinion in which Justice Holmes dissented and referred to wiretapping as "dirty business," on through *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) and *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), cases that ultimately spawned Title III. As does the language of the Senate Report itself, the prominent citation of these cases heralds the privacy interest as a bellwether of the Title III legislation, for these cases trenchantly articulate the importance of privacy in our polity.

Tracing and emphasizing these privacy interests which are at the heart of Title III, Mr. Justice Brennan, in *Gelbard,* quoted the Senate Report:

Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized. To assure the privacy of oral and wire communications, title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officers : . . .

408 U.S. at 48, 92 S.Ct. at 2361. Quoting further from the Senate Report, the *Gelbard* Court observed, "Only by striking at all aspects of the problem can privacy be adequately protected. The prohibition, too, must be enforced with all appropriate sanctions." *Id.* at 50, 92 S.Ct. at 2362. Justice Brennan then continued for the Court, referring to Title III's exclusionary rule, 18 U.S.C. § 2515, that the exclusionary rule

was central to the legislative scheme and that "[i]ts importance as a protection for 'the victim of an unlawful invasion of privacy' could not be more clear." 408 U.S. at 50, 92 S.Ct. at 2362.

In sum, *Gelbard* is permeated with references to the Congress' heightened concern for the right of privacy as being the polestar in the legislative history of Title III. Thus, Justice Brennan noted that the protection of privacy was an overriding congressional concern. *Id.* at 48, 92 S.Ct. 2357. More important, for purposes of this case, is another reference to the Senate Report: "The proposed legislation is intended to protect the privacy of the communication itself." *Id.* at 57 n. 10, 92 S.Ct. at 2362.

Against this background, which reflects an "overriding" congressional concern with privacy, it is now for us to determine whether Title III has created a privilege, applicable to this case, for those wire or oral communications which have been intercepted pursuant to Title III. As we make that determination, we will deal at length with the implications of the fact that we are here concerned with consensual interceptions, which arguably are excepted from the provisions and protections of Title III, a problem not before the *Gelbard* court.

## V. *Media Access to Title III Suppression and* Starks *Hearings*

### A. *Existence of the Privilege*

■ As we have earlier indicated, in the context of this case and the record made herein, the only basis on which the defendant can succeed in his motion to deny the media and the public access to the *Starks*/suppression hearing, at least in our view of the law, is if a privilege against disclosure attends the communications. We find that there is such a privilege.

The background of Title III as reflected in the legislative history that we have discussed, reflects Congress' recognition of the insidious nature of interceptions of oral and wire communications. Thus, it is not surprising that lengthy and elaborate congressional strictures provide for regulation of manufacture and distribution of intercep-

tion devices, confiscation of such devices, procedures for interception, and procedures for validation and use of intercepted communications. Further, a strict exclusionary rule protects against violation of these procedures. This system of extraordinarily strict and comprehensive protections contained in the very sinews of the statute leads us to believe that Congress constructed around private communications, vis-à-vis electronic interception, a privilege against disclosure applicable in all but very limited circumstances.

This construction thus stems not just from the legislative zeitgeist underlying Title III, but also from the statute's labyrinthian and comprehensive provisions. It is further supported by the express language of Title III. We refer to 18 U.S.C. § 2517. Section 2517 of Title III is the obverse, as it were, of the exclusionary rule in that it sets forth rules governing authorization for the disclosure and use of intercepted wire or oral communications. Subsection (3) of § 2517 provides that intercepted wire or oral communications may be disclosed "while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or any State or political subdivision thereof." This section not only provides for but is necessary to permit the disclosure of intercepted wire or oral communications in the referenced proceedings.

Subsection (4) of § 2517 says, "No otherwise privileged wire or oral communication intercepted in accordance with, or in violation of, the provisions of this chapter shall lose its privileged character." Subsection 2517(4) obviously refers to the classical privileges; *i. e.,* if the wire or oral communication intercepted is subject to the attorney-client privilege or the physician-patient privilege, it does not lose its privileged character by virtue of its being intercepted, even if intercepted in accordance with the provisions of Title III. In other words, a properly authorized interception, either by a district judge or by consent does not result in a privileged communication between attorney and client or husband and wife losing its privileged character.

We note, however, that the drafters might simply have said "no privileged wire or oral communication intercepted with or in violation of the provisions of this chapter shall lose its privileged character" and have covered the problem thoroughly. Instead they said "no *otherwise* privileged wire or oral communication intercepted in accordance with or in violation of the provisions of this chapter shall lose its privileged character." The courts, of course, are obliged to construe a statute so as to ascribe some meaning to all words used by Congress in the statute. Applying this principle to the statute before us, it seems to us that the use of the word "otherwise" signifies that communications that are intercepted in accordance with the chapter are likewise privileged, at least to some, although perhaps limited, extent, as governed by the statute itself.

We are supported in our interpretation by no less than an authority than Professor McCormick. In McCormick, *Evidence,* § 174 at 402 (2d ed. 1972), describing the Omnibus Crime Control and Safe Streets Act of 1968, which includes what we have been referring to as Title III, Professor McCormick says: "Even when a communication has been validly intercepted, the contents remain privileged except to the extent disclosure is specifically authorized."

We thus find in the legislative history, the structure, and the language of Title III a statutory privilege; our task now is to determine the extent and scope of that privilege.

### B. *Nature and Scope of the Privilege*

As we have observed, Title III contains a strict exclusionary rule, 18 U.S.C. § 2515, which provides that when wire or oral communications have been intercepted illegally, *i. e.,* in violation of Title III, neither the contents of such communications nor evidence derived therefrom "may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury," etc. This is a strong exclusionary rule and it has been so construed by the courts.

We had occasion to construe this exclusionary rule in an unreported opinion in *United States v. Dougherty,* Crim. No. 72–272. (E.D.Pa. Sept. 3, 1976). That matter was a probation violation proceeding wherein it was alleged that Mr. Dougherty had violated a probationary term we had imposed. It was further alleged, however, that the information based upon which the Government had obtained the evidence of probation violation came from an illegal wire interception. The traditional rule in probation violation cases is that illegally seized evidence is nonetheless admissible. But referring to *Gelbard* and the legislative history of Title III, we held that the Title III exclusionary rule was stronger than the traditional Fourth Amendment exclusionary rule and that evidence seized in violation of Title III was not admissible even in probation violation proceedings. This view was likewise adopted by our colleague Judge Ditter in *United States v. Manuszak,* 438 F.Supp. 613 (E.D.Pa.1977).

As far as we can ascertain, the Title III exclusionary rule is still strong. We note that those courts that have restricted it have done so only in a narrow context, *i. e.,* prosecutions for perjury. *See, e.g., United States v. Caron,* 474 F.2d 506 (5th Cir. 1973). *Caron* does quote language from the Senate Report that suggests that it was not the intention generally to press the scope of the suppression rule beyond "present" search and seizure law. 474 F.2d at 510. However, we interpret the legislative history referenced in *Caron,* particularly the term "present," in light of the law as it existed at the time of passage of Title III, and not in light of the law as it subsequently developed in *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1970), and in other developments during the 1970's. The limitations thus adopted by *Caron* are generally speaking narrower than the limitations of the exclusionary rule of the Fifth Amendment even after *Harris v. New York.* Indeed, *Caron* is consistent with the kind of privilege countenanced in § 502 of the Rules of Evidence as adopted by the United States Supreme Court but scuttled

by the Congress; *i. e.,* the privilege section. That section involved reports privileged by statute; such reports were privileged except in actions for perjury. *See generally* Weinstein, *Evidence* § 502[1] *et seq.* (1972). In any case, in light of the seemingly blanket statutory language, the correctness of the *Caron* exception to Title III's exclusionary rule has not been universally accepted. *See, e.g., Manuszak, supra,* at 616–17.

So, then, the privilege pertaining to wire and oral communications intercepted in accordance with Title III or in violation of Title III, as that privilege is reflected in Title III's exclusionary rule, is a broad one. We must now determine the application of that privilege to Title III *Starks* and suppression hearings.

### C. *Application of the Privilege*

█ The initial question to be addressed is whether to hold the suppression and *Starks* hearing in public or *in camera.* Only if we determine that the hearing must be held *in camera* need we decide a second question: whether and under what circumstances the record of the *in camera* hearing may be released into the public domain.

Addressing the first question, we observe that were we to hold the hearing in public with full access available to the media, only to determine at the hearing that the tapes were illegally obtained, then the very proceeding at which that determination was made would be the vehicle for disclosure of communications that were illegally acquired and of tapes that should never have been made. Such public disclosure would tear down the protective barricades erected by Congress around private communications and transform the *Starks*/suppression hearing from a tool for privacy's protection into an engine of its destruction. We conceive of no sound basis for working such a transformation and therefore determine that the privilege that we find to inhere in the structure, the express language, and the spirit of Title III—a privilege that protects the privacy of intercepted wire or oral communications—extends at least to the initial suppression and *Starks* hearing.

In access terms this is analogous to other privileges contexts, which we discussed earlier—the attorney-client privilege, the physician-patient privilege, and so forth—and requires that the public and the media be excluded from the initial suppression/*Starks* hearing. However, as we have noted, that does not end the inquiry because we must now determine whether the *record* of the hearing should be made public upon the hearing's completion.

█ We find no justification in law or logic for holding an admissibility hearing *in camera,* only to release the record even if the result of the hearing is a finding of *inadmissibility.* Merely delaying for a short time disclosure of illegally monitored private conversations would hardly be an adequate vindication of the privacy interests Congress considered to be so vital. Therefore, we find the Title III privilege to protect against disclosure of inadmissible wiretaps at or after a hearing.

What if, however, we determine that the intercepted oral or wire communications are presumptively *admissible,* does the privilege then dissolve? Does the privilege dissolve because the determination of presumptive admissibility has been made, and hence the communication has been determined lawful? Or must public disclosure be delayed until the final admission of the oral or wire communication at trial? That is the difficult question. We note that there is a lacuna in the ABA Standards at this point; the Standards do not address the question of what happens if the hearing held *in camera* results in a determination of presumptive admissibility.

Because Title III, in § 2517(3), authorizes the disclosure of legally intercepted communications while giving testimony under oath or affirmation, it is clear that the privilege does not protect against disclosure by sworn testimony at public trial. That is, the privilege evaporates no later than the point at which the conversations are admitted into evidence.

Such a construction is consistent with the parallel purpose of Title III. Although un-

derlying and permeating the language of Title III are privacy concerns, the fact is that Title III was enacted in the interests of law enforcement. *See* Senate Report, *supra*, at 2153, 2157–58. It was enacted to enable law-enforcement officers, under narrow and very strictly supervised conditions, to obtain evidence that is otherwise unavailable to them. This purpose is reflected in 18 U.S.C. § 2518(1)(c), which requires, in an application for interception of wire or oral communications, that the applying agent give the authorizing judge a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous. In other words, under Title III, although electronic surveillance is to be a last resort when nothing else will work, it is, nonetheless, an authorized law-enforcement tool.

 So, then, in light of the dual purposes of Title III—protection of privacy and promotion of law enforcement—does the privilege extend just to the point of determining admissibility or does it extend beyond that—until the point of actual admission at trial? Our research has disclosed no case law that helps us make that difficult and important determination. Indeed, as we have noted, this is a case of first impression. We observe, however, that McCormick, in his discussion of the Title III privilege to which we adverted earlier, considers a validly intercepted communication to remain privileged up to the point of statutorily authorized disclosure. *McCormick, supra,* at 402. Such disclosure can only take place in sworn testimony at a proceeding "held under the authority of the United States or of any State or political subdivision thereof." 18 U.S.C. § 2517(3). The question is whether a validation/suppression proceeding under *Starks* and 18 U.S.C. § 2518(10) should be considered to be the disclosure proceeding under § 2517(3) if the tapes are validated and suppression is denied.

When we consider Title III's complementary purposes of protecting privacy and pro-

viding law-enforcement officers with evidence for use at trial, we are led to the conclusion that the authorized disclosure should be construed only to take place in a proceeding *subsequent* to the *Starks*/suppression hearing. In other words, the privilege "remains" up to the point of subsequent disclosure under oath at trial. Indeed, the statute itself provides that disclosure of contents of an intercepted communication may be made only in the proceedings provided for in the statute *and* only when that evidence derives from an interception made in accordance with the provisions of Title III. Thus, § 2517(3) permits disclosure while giving testimony in a proceeding *if* that evidence was legally obtained. The statutory disclosure therefore seems to presuppose a prior determination of compliance with the statute.

We recognize that an opposite interpretation is possible; *i. e.,* that testimony and evidence at an *in camera* hearing for determination of presumptive admissibility constitutes the disclosure contemplated by § 2517(3) once such admissibility is found. Under this interpretation, the record of the hearing should be released after a determination of statutory compliance and recording authenticity. There are, however, practical problems with such an interpretation. For instance, the Government might elect, for any number of reasons, not to introduce the conversations at trial or, alternatively, to introduce only part of it. Or, the defendant might plead guilty on some or all of the charges against him before trial. In such cases, if the record of the suppression hearing were released upon a preliminary determination of admissibility there would have been public disclosure of material perhaps damaging not only to defendant but also to wholly innocent third parties, even though the disclosure was unnecessary from a prosecutorial perspective. We note that central to our interpretation of Title III is our perception of the congressional concern for the interests of third parties who might be mentioned in communications, as well as for persons who were parties to the communications but against whom the communications are not to be used. Premature disclo-

sure of intercepted communications when those communications may or may not even be needed as law-enforcement evidentiary material would not serve any interest of adjudicating the guilt or innocence of the defendant, but would sacrifice the parties' privacy.

To summarize, we think that the statutory scheme evidences a congressional intent to balance and give the fullest possible effect to *two* interests: privacy and law enforcement. To sacrifice at the referenced stage of these proceedings the privacy interests of the participants in oral communications and of third parties mentioned therein when the ultimate use of that evidence by the Government in its efforts to enforce the law is only speculative, would not carry out the congressional intent. Such disclosure would terminate privacy and vitiate the privilege without serving any legitimate testimonial law enforcement goal. Far from serving both congressional purposes, therefore, immediate disclosure at the point presumptive admissibility is determined would serve neither. We decline to take such a step.

### D. *Consensual Interceptions and Title III Privilege*

■ We have not yet addressed the question whether consensual interceptions of communications, allegedly the type of interceptions at issue in this case, are exceptions to Title III rather than being governed by Title III. A forceful argument was made by media counsel that a consensual interception is not strictly a Title III interception, controlled and constrained by Title III's strictures; therefore, the argument continued, whatever the validity of the

privilege we have found in Title III, that privilege does not apply to consensual interceptions, hence to this case. To this question we now turn.

There is no question but that the oral and wire communications at issue in this case are within the definitional ambit of those terms in Title III, 18 U.S.C. § 2510(1) & (2).[6] Nor can there be any question but that an interception took place within the meaning of Title III, 18 U.S.C. § 2510(4).[7] Consensual interceptions are provided for in Title III by § 2511(2)(c), which provides:

> It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

Media counsel have argued that the structure and phrasing of this subsection requires the conclusion that consensual interceptions are an exception to Title III and thus to Title III's privilege for intercepted communications. Phrasing similar to that of § 2511(2)(c) is found in § 2511(2)(a), governing interceptions by employees of the FCC, § 2511(2)(b), governing interceptions by employees of the FCC, and § 2511(2)(d), governing consensual interceptions by persons not acting under color of law. Immediately preceding § 2511(2), § 2511(1) provides for the illegality of interception of any oral or wire communication "except as otherwise specifically provided in this chapter." Following as they do in catalogue form this sweeping prohibition, a possible logical construction of § 2511(2)'s subsections is that each of these particular types of interceptions are exceptions to the broad-

---

**6.** 18 U.S.C. § 2510(1) provides:

"wire communication" means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate of foreign communications . . .

18 U.S.C. § 2510(2) provides:

"oral communication" means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation . . .

**7.** 18 U.S.C. § 2510(4) provides:

"intercept" means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device.

ly inclusive definition of "interceptions" set out in § 2510(4) and the broadly inclusive prohibition of interceptions set out in § 2511(1). In other words, rather than attempting to catalogue all possible circumstances in which the strictures of Title III would apply, Congress excepted only those few situations in which Title III would *not* apply.

This construction might appear to be supported by argument founded upon the interplay of § 2511(2)'s subsections and some of the other provisions of Title III: *e.g.,* § 2515 articulates a strong exclusionary rule that suppresses all interceptions in violation of Title III, yet any interceptions in situations governed by § 2511(2)'s subsections are by definition not unlawful under Title III; § 2516 provides for obtaining judicial authorization for interceptions in very limited circumstances, yet each of § 2511(2)'s subsections implicitly makes § 2516 and its limitations inapplicable; § 2517 provides for disclosure and use of intercepted wire or oral communications, yet two of the subsections of § 2511(2) explicitly make their own provisions for disclosure and use, provisions that are much less restrictive than § 2517; § 2518 sets out a rigorous procedure for interceptions, yet the language of § 2511(2)'s subsections obviates the statutory need for such procedures in the situations to which they apply; § 2519 requires reports of interceptions conducted pursuant to § 2518, yet this section omits any requirement for reports of interceptions under any of § 2511(2)'s subsections. It might thus seem that within the structure of Title III, § 2511(2) and the balance of the chapter operate independently. This in turn could lead to the conclusion that the interceptions authorized by § 2511(2) are beyond, not within, the structure of Title III.

It is an equally if not more plausible interpretation, however, that the authorized interceptions under § 2511(2) are among the interceptions "otherwise specifically provided in this chapter" to which § 2511(1) refers. Indeed, any argument that a § 2511(2)(c) consensual recordation of a conversation is not an "interception" within the meaning of Title III in general and § 2510(4) in particular is negatived by the specific language of § 2511(2)(c) which characterizes the preservation of a conversation by unilateral consent as an "interception." Thus, although a consensual interception of oral or wire communications under § 2511(2)(c) is by definition not the same as a judicially authorized interception under § 2516, neither is an FCC interception under § 2511(2)(b) nor a national security interception under § 2511(3). All these and others, however, are nonetheless provided for by Title III and there is nothing in the statutory language itself to prohibit the interpretation that each of these is an interception "otherwise specifically provided" in the chapter. Had the draftsman of § 2511(2)(c) said that consensual interceptions "shall be lawful" instead of saying that they shall "not be unlawful," (and there is no practical difference between the two approaches), there would be little, or at least far less doubt that consensual interceptions were fully integrated into Title III.

Media counsel argue, however, that their construction is supported by the judicial and legislative history of Title III. Decisions such as *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) and *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) had delineated certain strict constitutional criteria for electronic surveillance when no party to the surveilled conversation had consented to the surveillance. Yet neither of these decisions directly challenged the validity of such cases as *On Lee v. United States,* 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952), in which a wired-for-sound informant transmitted the defendant's incriminating statements to a government agent and *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), in which incriminating conversations with a government agent were recorded by a tape recorder concealed in the agent's pocket. Both *On Lee* and *Lopez,* of course, involved consensually monitored conversations. Thus, it would seem that consensual electronic surveillance was presumptively valid even in

the face of *Berger* and *Katz.* And, since for Congress the "major purpose of Title III was to combat organized crime," S.Rep.No. 1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad.News, pp. 2122, 2157 [hereinafter S.Rep.], and since Congress apparently felt that "Title III was drafted to meet [the *Berger*] standards and to conform with *Katz*," S.Rep. at 2153, intervenors suggest that there would have been no need to enact Title III to deal with consensual monitoring and, indeed, that Congress' primary focus in Title III must have been elsewhere, *i. e.* on *non*consensual electronic surveillance.

The validity of electronic surveillance by consent, despite *Katz* and *Berger,* was affirmed by the Supreme Court in *United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971). *White,* a decision in which six opinions were filed, upheld the constitutional validity of evidence obtained when one party to a conversation was equipped with a radio transmitter that enabled government agents to overhear the conversation. The plurality reached its decision making only a passing and ambiguous reference to Title III. 401 U.S. at 754, 91 S.Ct. 1122. The dissent of Justice Harlan, however, expressly noted that consensual interceptions are exceptions to "the general prohibitions against surveillance without prior judicial authorization." *Id.* at 791, 91 S.Ct. at 1145. Thus, it could be argued that Justice Harlan's dissent underscores the divergence between the nature of consensual interceptions and the thrust of Title III. *See also* Pulaski, *Authorizing Wiretap Applications Under Title III: Another Dissent to* Giordano *and* Chavez, 123 U.Pa.L.Rev. 750, 750 n.1 (1975) ("There are several exceptions to Title III's prohibition of unauthorized electronic interceptions. *The statute does not apply,* for example, *if a party to the wire or oral communication consents to its interception.*") (emphasis added); McCormick, *Evidence* 401 n.8 (2d Ed. 1972) ("Specific exception [from Title III] is made for a 'person acting under color of law' to intercept a communication 'where one such person is party to the communication or one of the parties to the communication has given prior consent to such interception.' ").

On the other hand, what Justice Harlan and the commentators say could with equal logic be read to signify only that when an interception is gained by consent, the judicial authorization requirements of § 2516 do not apply; that is, that consensual interceptions are exceptions to Title III *insofar as acquisition is concerned, but not as to disclosure.* In any case, it is neither dispositive nor helpful to analysis of the question to point out that under existing law Congress was not required to include consensual monitoring under the protective rubric of Title III in order to provide for the legality of such monitoring. For, even if Congress was not required by the state of Fourth Amendment law to raise threshold protections for private conversations intercepted consensually, it nevertheless might have chosen to do so. "Indeed, Congress has ample power to provide protection for the privacy of telephonic communications more comprehensive than that provided by the Fourth and Fourteenth Amendments." *Flaherty v. Arkansas,* 415 U.S. 995, 977 n.3, 94 S.Ct. 1599, 1600, 39 L.Ed.2d 893 (1974) (Douglas, J., joined by Brennan and Marshall, JJ., dissenting to denial of certiorari).

Turning again to the legislative history of Title III, we note that the Senate Report states:

Paragraphs (2)(c) [codified at 18 U.S.C. § 2511(2)(c)] provides that it shall not be unlawful for a party to any wire or oral communication or a person given prior authority by a party to a communication to intercept such communication. *It largely reflects existing law.*

S.Rep. at 2182 (emphasis supplied). The report then cites, *inter alia, Lopez, supra* and *On Lee, supra.* We recognize that one implication of this passage could be that Congress considered Title III unnecessary to authorize consensual surveillance. In the same vein, we rescribe the additional views of a dismayed Senator Hart, S.Rep. at 2227, who opposed passage of Title III, and was of the opinion that Title III was reported out of committee and eventually enacted, it "completely exempts all consensual wire-

tapping and eavesdropping from the provisions of the title. So long as at least one of the parties to a conversation has consented to its interception, Title III is inapplicable." *Id.* at 2236.

On the other hand, we also note that in articulating exceptions to the strict requirements of Title III, the Senate Judiciary Committee's Report lists only three such exceptions: national security interceptions, FCC interceptions, and communication common carrier interceptions. S.Rep. at 2153–54. Conspicuous by their absence are the two provisions for consensual electronic surveillance. We observe that the subsections of the statute authorizing the three types of interceptions listed by the Senate Report all contain provisions for use and disclosure of the communications obtained thereunder. In contrast, the omitted consensual interception provisions do *not* themselves provide for disclosure and use. A justifiable inference from all this is that consensual interceptions, excepted from Title III regarding the way in which the interceptions are *legitimated,* are not excepted from the privilege protections of Title III regarding the way in which the intercepted communications are *disclosed.*

We think such an inference best accommodates Congress' dual purposes of law enforcement and protection of privacy. Insofar as Congress' law enforcement goal was concerned, it would be appropriate to exclude consensual interceptions from the rigors of Title III *acquisition* requirements because such interceptions were permissible even without Title III in light of the continuing vitality of *Lopez* and *On Lee.* Congress, however, as we have noted, also had a second goal: protection of privacy. This goal implicates a question quite distinct from that of acquisition; that is, disclosure. To include in Title III with its extensive privacy protections only judicially authorized interceptions under § 2516 would appear to have been subversive of this complementary privacy purpose.

It is our opinion that the policy and privacy interests are the same whether communications are monitored with the consent of one of the parties or by judicial authorization.[8] We do not perceive that privacy interests of one party to a conversation are substantially lessened merely because the other party to the conversation, who consents to the electronic surveillance, could in any event testify to those very same conversations in open court. This is so because the privacy invasions resulting from interception of consensually monitored conversations may in fact exceed those resulting from judicially authorized interceptions. Consensual interceptions are not limited in time or space. Indeed, when judicially authorized interceptions are involved, the monitoring agents are statutorily required to minimize interceptions whereas when persons, premises, or telephones are "wired" by consent, no such minimization is always feasible, much less required. Further, sophisticated modern electronic techniques have made possible verbatim recordation of lengthy conversations, whereas no mortal could recall such conversations in replete detail and testify to them accordingly. As Senator Hart stated:

> the risk created by electronic recording is of an entirely different order from the risk of repetition involved in normal conversations, and . . . consensual electronic surveillance presents grave dangers to free and open expression in our society. None of us is so circumspect in our speech that we can countenance the later use of our most private utterances, played with the shattering impact of a broadcast in our own words.

S.Rep. at 2236.

We are supported in this regard by *Arnold v. County Court,* 51 Wis.2d 434, 187 N.W.2d 354 (1971), in which the Wisconsin Supreme Court construed the Wisconsin electronic surveillance statute, specifically patterned after Title III, in the context of a consensually monitored conversation. The

---

8. We reiterate at this point that we refer to protected privacy interests under the *statute,* which are not necessarily the same as "justifiable expectations of privacy" under the Fourth Amendment. *See generally White, supra; Flaherty, supra* (Douglas, J.).

**1122**

court found a privilege against disclosure to inhere in the statute unless the statutory authorization procedures were followed. Recognizing that the statute declared that "it is not unlawful" to intercept oral or wire communications by consent, the *Arnold* court found this provision not to address the question of disclosure, but only interception. The court went on to hold that unless the specific statutory authorization procedures were followed, the interception itself may not have been unlawful for criminal or tort law purposes but the statutory privilege nevertheless prohibited introduction of the intercepted communication into evidence over the aggrieved party's objection at trial. The federal statute would permit a similar construction.[9]

In our case, of course, we do not go so far as the Wisconsin court in holding consensually intercepted conversations inadmissible unless the interceptions also complied with the judicial authorization provisions of Title III. The Third Circuit has already decided that question in favor of admissibility. *See United States v. Santillo,* 507 F.2d 629 (3d Cir.) cert. denied *sub nom. Buchert v. United States,* 421 U.S. 968, 95 S.Ct. 1960, 44 L.Ed.2d 457 (1975); *United States v. Osser,* 483 F.2d 737 (3d Cir. 1973). In any event, since the privilege we have articulated is grounded in the background, structure, and language of the statute rather than in some disembodied penumbral privacy right, we see no reason to extend the privilege beyond the point contemplated by the statute itself. Indeed, § 2517(3) provides:

> Any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication

or such derivative evidence while giving testimony under oath or affirmation in any proceeding . . . .

This language, authorizing disclosure in any case where the interception was in accordance with the provisions of the chapter, should be read to include interceptions by consent since such interceptions are in accordance with § 2511(2)(c), one of the provisions of the chapter.

From this perspective, consent is one way in which electronic surveillance is legitimated; judicial authorization is another. The distinction goes more to modes of statutory compliance than to levels of privilege. Analogously, a conventional search and seizure may be legitimated either by warrant or consent. But if what were seized were trade secrets, those secrets would not lose their privileged character merely because the seizure was made by consent. To be sure, if a person consents to having his conversation monitored and then wishes to disclose the conversation, he may do so. Indeed, he may do so whether or not he initially consents to government agents monitoring the conversation. Such voluntary disclosure by a party to the conversation, however, is far different from the government, through validation/suppression hearings, being the vehicle for that disclosure. The Title III statutory privilege is less extensive than the trade secrets privilege, for when obtained in compliance with Title III, monitored conversations lose their privilege at trial. 18 U.S.C. § 2517(3). However, such abrogation of the privilege requires compliance with Title III in the first instance.

In sum, we are satisfied that consensual interceptions of communications are within the structure of Title III such that the disclosure provision of the statute is applicable thereto.

---

**9.** As we have already noted, of the five § 2511 "exceptions" to Title III, three include their own disclosure provision. A fair construction of this statutory distinction would be that disclosure and use of all "not unlawful" interceptions must comply with the provisions of Title III; that is, with the disclosure provisions of § 2511 or § 2517. If no disclosure is provided in § 2511, the disclosure is governed by § 2517.

Section 2511(2)(c) contains no disclosure provision; therefore a § 2511(2)(c) interception is governed as to disclosure by § 2517. The argument from *Arnold* would continue to the effect that § 2517 requires compliance with § 2516 and § 2518. Therefore, under this construction disclosure of a "not unlawful" § 2511(2)(c) interception would depend upon compliance with §§ 2516 and 2518.

## VI. *Conclusion*

For the reasons expressed at such length, we hold that the suppression and *Starks* hearings must be held *in camera* and that the public and the media may not have access thereto. We order that the record of the proceedings remain closed to the public and media unless and until portions of the intercepted conversations are introduced into evidence at trial.

In conclusion, we note that our decision is a narrow one. It applies only to hearings to suppress oral and wire communications intercepted under Title III. We have cognized the interest of the press in reporting the subject matter of such a suppression hearing, having referred to the legitimate public interests in what the tapes might reflect as to the activities of an important public figure with respect to his stewardship in office and with respect to how law enforcement activities are conducted. Our decision, however, is not based on a broad First Amendment/Sixth Amendment balancing. Rather, we find in Title III a privilege that protects these communications from disclosure prior to their introduction into evidence at trial.