*374 OPINION OF THE COURT
Wachtler, J.
During the course of pretrial suppression hearings in a highly publicized murder 'caseT "the-eourt- directed that the evidentiary proceedings be closed to the public, including the press. The closure order was imposed as a means to ensure the defendants’ right to a fair trial by forestalling the prejudicial effects of further notoriety. In this article 78 proceeding in the nature of prohibition, the petitioner, a disseminator of news through press and television, claims that the court’s action violated First Amendment guarantees and the Sixth Amendment right to a public trial. In what is hardly a novel conflict, its claim presents an open issue within the "free press—fair trial” controversy (see Matter of Oliver v Postel, 30 NY2d 171, 183; Matter of United Press Assns. v Valente, 308 NY 71, 85; cf. Nebraska Press Assn, v Stuart, 427 US 539, 564, n 8).
This claim to unrestricted media access to criminal proceedings of public interest stems from an unusual matter locally known as "the Clapp murder case”. Wayne Clapp was a former town policeman. He had lived his entire 42 years in the Rochester area and had developed deep ties in the surrounding rural communities. On July 19, 1976, he was reported missing.
According to reports in the news media, including the petitioner’s two daily papers and Rochester television station, Clapp had last been seen leaving Roy’s Marina accompanied by two unidentified youths. His boat had later been returned, laced with bullet holes. But his pickup truck and .357 magnum revolver, along with the two strangers, had vanished. Divers began searching Seneca Lake for Clapp’s remains. The body of the deceased, however, was never recovered.
On July 22, the media announced that a nationwide police alert for Clapp’s truck had proved successful. Michigan police had spotted the vehicle and, after a three-hour chase requiring helicopters and tracking dogs, they arrested a 16-year-old Texas youth, Kyle Greathouse, and his 21-year-old traveling companion, David Jones. The next day, front page articles revealed that Greathouse, apparently acquiescing to police requests, had led Michigan authorities to the location where he had buried the stolen revolver. The press later reported, without expanding, that the suspects had made admissions or *375 confessions before waiving extradition proceedings and being returned to New York.
A Seneca County Grand Jury returned a lengthy indictment charging the two youths with second degree murder and robbery. On August 6, petitioner’s morning daily reported that the accused "pleaded innocent yesterday * * * at their arraignment before Seneca County Court Judge Daniel De Pasquale. 'Not guilty, your honor,’ the 16-year-old Greathouse answered * * * Jones gave the same response.”
At the commencement of a pretrial suppression hearing, defense attorneys argued that an unabated buildup of adverse *, publicity had already jeopardized their clients’ ability to receive a fair trial. To minimize the prejudicial effects of further disclosures, they asked that the pretrial proceedings be held in-camera. The District Attorney had no objections. In an oral ruling, the court concluded that "these matters are in the nature of a Huntley hearing and suppression of physical evidence, and it is not the trial * * * Certain evidentiary ■ matters may come up in the testimony of the People’s witnesses that may be prejudicial to the defendants, and for those reasons the court is going to grant both [defendants’] motions.” The public, including the petitioner’s staff reporter, were removed from the courtroom. The suppression hearing then commenced and continued in camera to its conclusion the next day.
Three days later, counsel for Gannett appeared and asked the County Court to reconsider and vacate its ruling nunc pro tunc. Since the proceedings had already been concluded, a copy of the hearing transcript was also requested. While finding this intervention untimely, the court accommodated the asserted public interest. It signed Gannett’s show cause order directing both the defense and the People to justify withholding the transcripts. The issues were fully briefed, and on November 16, the merits were argued. But the advantages of hindsight and further debate only reinforced the court’s initial determination that open suppression hearings, if exposed to notoriety, would have deprived Greathouse and Jones of any meaningful opportunity to receive a fair trial. The court’s original finding of "a reasonable probability of prejudice to the defendants” not only justified closure in the first instance but, in the Trial Judge’s view, applied with equal force to the request for transcripts as well.
The Appellate Division disagreed and, while trial in the *376 criminal proceeding was still pending, granted the petitioner’s renewed request for access to the sealed records. Its Per Curiam decision, while purporting to resolve what had already become an° academic dispute,[1] has nonetheless provided a conduit through which critical aspects of the "free press—fair trial” controversy have been presented for review.
We would ordinarily decline the invitation and dismiss the appeal, taken by the respondents in the article 78 proceeding, for mootness. But this is far from an ordinary appeal. It crystallizes a recurring and delicate issue of concrete significance both to the courts and the news media. And in its broadest implications, it presents a challenge to a fundamental precept of judicial administration—the courts’ inherent power to control their own process. For these reasons, combined with the fact that matters of this character typically evade review, we have retained jurisdiction to entertain the appeal (see Matter of Oliver v Postel, 30 NY2d 171, 178, supra; Matter of United Press Assns. v Valente, 308 NY 71, 76, supra; cf. East Meadow Community Concerts Assn, v Board of Educ., 18 NY2d 129, 135; Matter of Rosenbluth v Finkelstein, 300 NY 402, 404; see, generally, Cohen and Karger, Powers of the New York Court of Appeals, pp 420-421).
Criminal trials are presumptively open to the public, including the press. Public access is secured through a fundamental concept said to be rooted in distrust for secret tribunals—the inquisition, star chamber and lettre de cachet (Matter of Oliver, 333 US 257, 268-270). It is typically the defendant, however, who reminds us on appeal from cases of compelled closure that the right to a public trial is a constitutional guarantee which "the accused shall enjoy” (US Const, 6th Arndt; Civil Rights Law, § 12; former Code Crim Pro, § 8; see, e.g., People v Hinton, 31 NY2d 71, cert den 410 US 911). .It is after all the defendant whose right to a "fair trial in fair tribunal” (Matter of Murchison, 349 US 133, 136; People v McLaughlin, 150 NY 365, 375) and whose very liberty is in jeopardy. And because it is the defendant who suffers directly when wrongfully deprived of public vigilance against possibly unjust prosecution or potential abuse (or nonuse) of judicial discretion, the right to insist on a public trial is primarily that *377 of the accused (Matter of Oliver, supra, at pp 268-271; United States v Sorrentino, 175 F2d 721, 722-723; compare People v Jelke, 308 NY 56, with Matter of United Press Assns. v Valente, 308 NY 71, 80-81, supra).
In practice, this priority need not detract from the public’s general interest in the assurance of fair as well as effective enforcement of its laws. Though somewhat attenuated in comparison with a defendant’s self-interest, each of us shares a stake in an adversary system which consistently dispenses our penal laws impartially (US Const, 5th, 6th, 14th Arndts; NY Const, art I, §§ 2, 6), free from needless prejudicial/ publicity (see, e.g., Sheppard v Maxwell, 384 US 333). Ordinarily, public trials "serve to instill a sense of public trust in our judicial process” (People v Hinton, supra, at p 73). But this assumes that public access in a given case poses "no threat or , menace to the integrity of the trial” (Craig v Harney, 331 US , 367, 377). Because this assumption sometimes fails, neither / the public nor the press has an absolute right to attend all / stages of all criminal trials (e.g., Estes v Texas, 381 US 532, 538; Matter of United Press Assns. v Valente, supra, at p 81). Particularly where a fair trial may hang suspended in the balances, the Constitution should not be considered as a substitute for a sunshine law (see Public Officers Law, §§ 85- ( 89, as amd by L 1977, ch 933; Freedom of Information Act, US Code, tit 5, § 552).
The public’s right to demand access to criminal trials, let alone suppression hearings, was never intended to comprehend outside interference with orderly judicial process. The public trial concept has therefore "never been viewed as imposing a rigid, inflexible straitjacket on the courts. It has uniformly been held to be subject to the inherent power of the court to preserve order and decorum in the courtroom, to protect the rights of parties and witnesses, and generally to further the administration of justice” (People v Jelke, supra, at p 63; accord United States ex rel. Lloyd v Vincent, 520 F2d 1272, 1274, cert den 423 US 937). To this end, the inherent power to limit public access has become a common and integral aspect of due process in trials for particularly sensitive crimes (Judiciary Law, § 4) or, for instance, where closure is necessary to protect a witness’ identity (People v Hinton, 31 NY2d 71, 73, supra), or life (People v Hagan, 24 NY2d 395, cert den 396 US 886) or delicate emotional state (People v Smallwood, 31 NY2d 750; United States ex rel. Smallwood v *378 La Valle, 377 F Supp 1148, affd 508 F2d 837, cert den 421 US 920).[2] Of course, the policies underpinning closure in these matters dictates the sealing of documents and transcripts as well (e.g., Domestic Relations Law, § 235). And in all of these cases, the remedy—legislative or judicial—has called for "a sensitive and wise balancing of the rights of the individual defendant and the interests of the public” (People v Darden, 34 NY2d 177, 181-182).
In other words, we encourage accountability through public legal proceedings and the truthful reporting of whatever transpires in open court (see Civil Rights Law, § 74), but "[only] so far as that object can be attained without injustice to the persons immediately concerned” (Estes v Texas, supra, at»p 542, quoting 2 Cooley’s Constitutional Limitations, p 931 [Carrington ed, 1927]). Having imposed on the Trial Judge an affirmative obligation to ensure this balance (Sheppard v Maxwell, supra, at pp 352-363; Irvin v Dowd, 366 US 717), it would be anomalous indeed to withhold the discretionary power necessary to achieve it.
In the case now before us, the Trial Judge was not presiding over a trial on the merits. His concern was with a suppression hearing which, of course, is "not within the specific meaning of 'trial’ ” (People v Anderson, 16 NY2d 282, 288; see Maurer v People, 43 NY 1, 3; Hopt v Utah, 110 US 574). The court at this stage was not yet forced to insulate an already impaneled jury from extrinsic and inadmissible evi- ; dence of guilt (see Murphy v Florida, 421 US 794; Gonzales v Beto, 405 US 1052; Parker v Gladden, 385 US 363; Jenkins v United States, 380 US 445). Its task instead was to ensure that further pretrial publicity would not impermissibly alter a defendant’s status in the public eye from that of a suspected killer to that of a confessed murderer.
Before any challenged evidence could be submitted to a jury, due process required the Trial Judge to fully and independently resolve, as a matter of law, that the evidence was not obtained in violation of the fundamental constitutional rights of the accused (e.g., Miranda v Arizona, 384 US 436, 467; Jackson v Denno, 378 US 368, 394; Mapp v Ohio, 367 US *379 643; People v Huntley; 15 NY2d 72, 78). Knowing how damaging the introduction of this evidence could be to a defendant, and that widespread knowledge even of inadmissible evidence could nonetheless predetermine guilt (e.g., Sheppard v Maxwell, 384 US 333, supra), we require the Trial Judge to ensure that tainted evidence never see the light of day (CPL 710). Suppressed evidence should not be used to determine a defendant’s guilt, not at trial and certainly not before trial through publication of illegally obtained evidence by the media, whose credibility is the envy of many institutions (see United States v Nixon, 418 US 683, 714). At their option, the defendants could have later challenged before a jury the voluntariness of their confessions. But this choice is for the accused, not the press.
Defendants Greathouse and Jones sought to invoke these constitutional norms, not by excluding the public or the press from a highly sensationalized murder trial, but rather by excluding allegedly tainted evidence of guilt. The petitioner nonetheless urges us to rule that the trial court’s protective order, however well intentioned, was a nullity in the face of the media’s superior right to be free from prior restraint on publication (US Const, 1st Arndt; NY Const, art I, § 8).
To be sure, when a restraint is imposed to prevent ^ commentary on known facts about a pending criminal case, tensions between First and Sixth Amendment rights are j greatest. The Supreme Court in Nebraska Press Assn, v Stuart (427 US 539, 570, supra) agreed that "the barriers to prior restraint remain high”. In that case, a "gag order” modified by the Nebraska Supreme Court prohibited the press from reporting or commenting on judicial proceedings which had been held in open court. Reporters had attended the "public event”; they had seen and heard what transpired. To prevent dissemination of that highly prejudicial information, the State court purported to restrain all news reports of "confessions or admissions * * * and other information strongly implicative of the accused as the perpetrator of the slayings” (State v Simants, 194 Neb 783, 801). Because "[t]hose who see and hear what transpired can report it with impunity” (Craig v Harney, 331 US 367, 374, supra; see Oklahoma Pub. Co. v District Ct., 430 US 308, 311; Nebraska Press Assn, v Stuart, supra, at p 568; Sheppard v Maxwell, supra, at pp 362-363), the restrictive order was subject to a "heavy presumption against” prior restraint and was ultimately condem *380 ned as "clearly invalid” (Nebraska Press Assn, v Stuart, supra, at p 570).
This, of course, does not mean that trial courts are left powerless to stem improper revelation of facts that would present an imminent threat to the impaneling of a constitutionally impartial jury. In fact, as an additional alternative to a trial court’s "benign neglect” outlined in Sheppard v Maxwell (supra, at pp 357-362), the majority in Nebraska Press left open the prophylactic adopted in the case at bar—"[closing of pretrial proceedings with the consent of the defendant” (Nebraska Press Assn, v Stuart, supra, at p 564, n 8; see p 576, n 3; p 584, n 11 [Brennan, J., concurring]). Continuance, extensive voir dire examinations, limiting instructions or venue changes may prove paltry protection for precious rights (see, e.g., Jury System in America [Simon ed, 1975]). Reversals and new trials are hardly acceptable alternatives. The extent of the media’s right to access should not remain unresolved, for it places in issue the very integrity of our courts.
To allow public disclosure of potentially tainted evidence, which the trial court has the constitutional obligation to exclude, is to involve the court itself in the illegality. This potential taint of its own process can neither be condoned nor countenanced. To avoid becoming a link in the chain of prejudicial disclosures, trial courts have the power to exclude the public from pretrial suppression hearings (see ABA Standards Relating to the Administration of Criminal Justice, Pretrial Hearings, § 3.1, p 203 [1974]).<\At the point where press commentary on those hearings would threaten the impaneling of a constitutionally impartial jury in the county ovenue, pretrial evidentiary hearings in this State are presumptively to be closed to the public.
As the locus of public interest, this determination is to rest with the hearing Judge. Of primary consideration is the public’s interest in avoiding any developments that would threaten to truncate a defendant’s right to a fair trial. This concept is premised on the right to an impartial jury as the arbiter of guilt or innocence. To maintain that right, the hearing Judge must have the means to ensure that prospective veniremen do not hear matters from which, by law, they should be insulated.
This was precisely the problem confronting the hearing Judge in the case at bar. The public knew that codefendants *381 Greathouse and Jones had been caught "red-handed” by Michigan police with fruits of the crime. And it was widely known that the defendants had made incriminating statements before being returned to this State. The details, however, were not known, and public curiosity was intense. To safeguard the integrity of its process, the court was required at the outset to distinguish mere curiosity from legitimate public interest.
In so doing, the courts should of course afford interested members of the news media an opportunity to be heard, not in the context of a full evidentiary hearing, but in a preliminary proceeding adequate to determine the magnitude of any genuine public interest. This may be found to outweigh the risks of premature disclosures. In trials involving public officials, for instance, the public may have an overwhelming interest in keeping all proceedings open.[3]
That level of legitimate public concern was not reached in this case. Widespread public awareness kindled by media saturation does not legitimize mere curiosity. Here the public’s concern was not focused on prosecutorial or judicial accountability; irregularities, if any, had occurred out of State. The interest of the public was chiefly one of active curiosity ) with respect to a notorious local happening. While the defendants were still in jeopardy, any true public interest could be fully satisfied, consonant with constitutional free press guarantees, by affording the media access to transcripts redacted ' to exclude matters ruled inadmissible during the closed suppression hearing (cf. Department of Air Force v Rose, 425 US 352, 370-382). Complete transcripts were made available when the defendants’ interests were no longer in jeopardy. The public’s "right to know” was then compatible with the defendants’ right to a fair trial.
This conclusion would ordinarily lead to a reversal inasmuch as the Appellate Division had directed full pretrial disclosure. As noted, however, since the questions presented by this appeal became moot when the pleas were entered, and the relief requested would now serve no purpose, the judgment appealed from should be modified, without costs, to the extent of dismissing the petition solely for that reason.

. The transcripts had already been offered for the petitioner’s use. The need for sealing them had disappeared after codefendants Greathouse and Jones, in satisfaction of the indictment pending against them, pleaded guilty to lesser included crimes.

. Secrecy is also the rule in Grand Jury hearings for felony cases (CPL 190.25; see People v Miller, 257 NY 54), professional disciplinary investigations and proceedings (Judiciary Law, § 90; see Matter of Nichols v Gamso, 35 NY2d 35), matrimonial actions (Shiles v News Syndicate Co., 27 NY2d 9; Danziger v Hearst Corp., 304 NY 244) and Family Court proceedings (e.g., Family Ct Act, § 1043; 22 NYCKR 2830.8).

. Whereas the obligation of nondisclosure in pretrial hearings is for the purpose of insulating prospective veniremen, in certain other situations, such as those involving the identification of an informer, total preclusion from any public knowledge may be called for (cf. People v Darden, 34 NY2d 177, supra; People v Goggins, 34 NY2d 163).