In the Matter of MARIO MEROLA, on Behalf of the People of the State of New York, Petitioner, v HOWARD E. BELL, as a Justice of the Supreme Court of the State of New York, et al., Respondents.

In the Matter of NEW YORK NEWS, INC., Petitioner, v HOWARD E. BELL, as a Justice of the Supreme Court of the State of New York, et al., Respondents.

First Department, May 10, 1979

## APPEARANCES OF COUNSEL

*Alan D. Marrus* of counsel for Mario Merola, petitioner.

*Robert J. Schack* of counsel (*George D. Zuckerman* with him on the brief; *Robert Abrams, Attorney-General*), for Howard E. Bell, respondent.

*Stanley Green* for Robert Davis, respondent.

*Rudolph W. Giuliani* of counsel (*Robert D. Sack, Kenneth A. Caruso* and *Frederick D. Friedman* with him on the brief; *Patterson, Belknap, Webb & Tyler*, attorneys), for New York News, Inc., petitioner.

## OPINION OF THE COURT

SULLIVAN, J.

On September 19, 1978, John Hernandez was shot and killed on a subway platform in The Bronx, after he had been followed off a train by three youths who were haranguing him and demanding money. Three hours later defendant, Robert Davis, 13 years of age, was picked up by the police as a suspected runaway. During questioning he told a confused story about being a witness to a shooting. He was released to his mother's custody, but was rearrested three days later, arraigned for the murder of Hernandez, and remanded without bail. On October 31, 1978, he was indicted on two counts of murder in the second degree. Bail was eventually set at $5,000 and later raised to $15,000. Unable to make bail, defendant remains incarcerated.

Notwithstanding a newspaper strike in New York City, defendant's initial court appearances received extensive coverage on television and radio, and in the nonstriking newspapers. It was reported that he was the first juvenile to be charged with murder under the State's "tough new juvenile crime law" and the youngest person ever so to be charged in the State of New York. This coverage continued with his subsequent arraignment on the indictment. One of the newspaper articles carried the headline "He's a killer! Widow in court outburst!"

A hearing was scheduled for March 19, 1979, on the admissibility of statements allegedly made by defendant to various police officers and Assistant District Attorneys. Although defendant originally spoke of being a witness to a murder, he apparently eventually implicated himself as an accomplice in

the killing. Among those present in the courtroom on March 19 were reporters from Associated Press, United Press International (UPI), the *New York Post* and WPIX (Channel 11). Justifiably apprehensive of the prejudicial effect that widespread publicity would have on any potential jurors, especially in the light of the extensive publicity the case had generated in its earlier stages, defendant moved to bar the public and the press from the courtroom during the hearing. Trial Term denied the request and adjourned the hearing to the next day.

That evening various television and radio stations broadcast stories about a new crackdown by the Mayor of the City of New York on crime in the subways. Interspersed with these accounts were reports of defendant's trial. The next morning, prior to the commencement of the hearing, the Trial Justice advised counsel that he had viewed a telecast the evening before about the efforts to increase police protection on the subways, which concluded with the comment, "Too bad they didn't have that back in September when Davis allegedly participated in the killing of John Hernandez." The comment was followed by a showing of a wedding picture of the deceased Hernandez and his wife. The Trial Justice also stated that he had heard a radio report that morning that pretrial hearings were being conducted in the Davis trial, and that the People would seek to introduce a videotaped statement by defendant in which he admitted to the killing of Hernandez. At about the same time that the Trial Justice was voicing these concerns the morning edition of that day's *New York Post,* carrying a story headlined "Videotape is Key in Teenager Trial", under an artist's sketch of defendant with his mother in the courtroom, was already on the newsstands.

Significantly, in attendance at the courtroom that morning were reporters from the *Daily News,* the *Post,* NBC, CBS, and UPI. Thus, before a single word of testimony had been taken, and when only a pretrial hearing on a suppression issue was pending, the media were already flocking to the courtroom and the case itself was generating considerable publicity.

In the wake of this sudden burst of renewed publicity which had emerged overnight, the Trial Justice advised the parties that he would reconsider the application for closure, noting that the first he had heard of the videotaped confession was on the morning radio report. An opportunity to argue in opposition was given not only to the People, who had opposed the motion the day before, but also to the press, which, after a

recess for the purpose of contacting counsel, had an attorney present to present its position.

Following argument, the Trial Justice ordered that the press and the public, except for the immediate members of the family of defendant and the victim, be excluded from the courtroom during the suppression hearing, but offered to make available daily copy of a transcript of the proceedings, redacted to omit any statements attributed to defendant. He also granted a stay pending review by this court of his order.

At the outset, it ought to be recognized that this is not the ordinary, garden-variety street crime, as the dissent seems to suggest. The case has attracted widespread publicity. Defendant is the first 13-year-old to be prosecuted as an adult under the recently enacted amendments to the Penal Law dealing with juvenile crime. Moreover, he is charged with complicity in the vicious murder of a subway passenger on his way home from work. Because of its hybrid nature as a legal novelty and media sensation, the case is of great interest. In addition, at the time the hearing was to commence, public officials in the City of New York were engaged in a well-publicized campaign against crime in the subways, after the occurrence of a series of violent crimes. Obviously, this served to focus more attention on the prosecution of defendant.

The right to a public trial is not absolute and "must be balanced against other interests which might justify the closing of the courtroom to the public." *(United States ex rel. Lloyd v Vincent,* 520 F2d 1272, 1274.) Consequently, closure of a courtroom has been permitted even over the wishes of a defendant. "The public trial concept has * * * never been viewed as imposing a rigid, inflexible straitjacket on the courts. It has uniformly been held to be subject to the inherent power of the court to preserve order and decorum in the courtroom, to protect the rights of parties and witnesses, and generally to further the administration of justice." *(People v Jelke,* 308 NY 56, 63, citations omitted.) Here, it is defendant who has made the motion to close the courtroom for what is, undeniably, a legitimate interest, the protection of his right to a fair trial. Like the accused in *Matter of Gannett Co. v De Pasquale* (43 NY2d 370, 378), he has asked the court "to ensure that further pretrial publicity would not impermissibly alter [his] status in the public eye from that of a suspected killer to that of a confessed murderer."

At this stage of the criminal prosecution defendant's rea-

sons for keeping any confession or statement from public knowledge are twofold. He seeks to prevent disclosure to potential jurors of the contents of any tainted confession which he is successful in suppressing.* Clearly, "[s]uppressed evidence should not be used to determine a defendant's guilt, not at trial and certainly not before trial through publication of illegally obtained evidence by the media". *(Matter of Gannett Co. v De Pasquale,* 43 NY2d 370, 379, *supra.)*

The closure here is a limited one. As soon as a jury is impaneled and, if necessary, sequestered, or the circumstances are such that the probability of a suppressed confession prejudicing defendant no longer exists, the press will be able to publish whatever it chooses about the suppression hearing. On the other hand, permitting courtroom access to the media, with its capacity to disseminate the details of defendant's confession to every prospective juror in Bronx County, whatever its population, creates a reasonable probability of prejudice which would threaten the impaneling of a constitutionally impartial jury. (See *Matter of Gannett Co. v De Pasquale,* 43 NY2d 370, 380, *supra.)*

Even should none of the statements be suppressed, defendant has an interest in keeping from prospective jurors the fact that a Judge has already found his statements voluntary and constitutionally sanctioned as evidence. This is a material and realistic concern.

The dissent perceives the risk of prejudice as minimal, when balanced against the public's right to know "how the new juvenile offender statutes are working in practice, including the applicability of suppression issues to cases where the defendant is 13 years old." It is difficult to appreciate how a temporary delay in reporting the details of a confession denies that right. In any event, at the fulcrum of any balancing of these competing interests should be the recognition that there are, or will be, innumerable trials to avail the public of its right to know. On the other hand, defendant, whose liberty is at stake, has only one trial.

The dissent seeks to distinguish *Gannett* by pointing out that the victim there was a public official and locally prominent, whereas the crime involved here is not uncommon in Bronx County. Although, unfortunately, murder is not that

---

* Since, apparently, the People's case consists chiefly of defendant's admissions, the importance of keeping them from publication cannot be overstated.

rare an occurrence in Bronx County, it is equally true that the increasing incidence of violent crimes has made its residents acutely crime conscious and concerned for their personal safety. This is no doubt true of all large urban centers. This concern is reflected in the Legislature's recent amendment of the Penal Law to provide for adult treatment of juveniles such as defendant, along with the public outcry for increased police protection and stricter punishment, including the death penalty. Daily, the focus of the media is on violent crime and its effects, e.g., desolated streets, deteriorating neighborhoods, unsafe subways, and frightened citizens. The public is concerned with violent crime because it is affected by it, and, hence, the report of a 13-year-old boy armed with a gun on a subway would command a significant amount of individual attention. With morning and afternoon newspapers, around-the-clock radio, and at least seven major television stations, it is highly unlikely that the details of a confession to what was apparently a cold-blooded and vicious crime will escape the attention of most potential jurors in Bronx County, an area which has been battered by the trauma of violent crime. And the danger to defendant's right to a fair trial can all be avoided by withholding the details of any confession until such time as the danger that the verdict may be affected by their premature publication has passed. The precedent exists. The Court of Appeals in *Gannett (supra)* expressly sanctioned closure as a discretionary power in the hands of a Trial Judge so that he might fulfill his affirmative obligation to insure a proper balance between a defendant's right to a fair trial and the public's right to an open forum. And, in *Nebraska Press Assn. v Stuart* (427 US 539, 568) the United States Supreme Court intimated that closure was a respectable alternative: *"The County Court could not know that closure of the preliminary hearing was an alternative open to it* until the Nebraska Supreme Court so construed state law; but once a public hearing had been held, what transpired there could not be subject to prior restraint." (Emphasis added.)

In this regard the *Gannett* court fixed the judicial responsibility: "To allow public disclosure of potentially tainted evidence, which the trial court has the constitutional obligation to exclude, is to involve the court itself in the illegality. This potential taint of its own process can neither be condoned nor countenanced. To avoid becoming a link in the chain of

prejudicial disclosures, trial courts have the power to exclude the public from pretrial suppression hearings [citation omitted]. At the point where press commentary on those hearings would threaten the impaneling of a constitutionally impartial jury in the county of venue, pretrial evidentiary hearings in this State are presumptively to be closed to the public." (*Gannett, supra*, p 380.)

At this point we can only speculate as to how much publicity the case will attract. But one fact seems eminently clear. The level of publicity which the dissent would require before the remedy of closure is invoked is precisely the danger that defendant is trying to avoid. And it is small succor to him to suggest an adjournment between hearing and trial to allow the residual effect of any adverse publicity to abate. Defendant has been incarcerated since last September and he has a constitutional right to a speedy trial.

Closure has one other benefit. In the event of a conviction it obviates the necessity of a retrial, mandated because the adverse effects of publicity, which could have been avoided, resulted in the denial of a fair trial.

Finally, as commendable as is the dissent's concern that approval of this order would set a precedent for closure in a significant number of cases where there is only minimal publicity, it fails to take into account the discernment and sensitivity of our Trial Judges. The concept of a public trial is fundamental to our system. Closure is a drastic remedy, reluctantly invoked in any case, but necessary in those cases where the right to a fair trial, equally fundamental, is jeopardized.

Accordingly, inasmuch as Trial Term properly exercised its discretion, the application for an order in the nature of prohibition, pursuant to CPLR article 78, should be denied and the petitions dismissed, without costs or disbursements.

SANDLER, J. P. (concurring). The question presented is both close and difficult. However, I find the analysis set forth in Judge SULLIVAN's opinion compelling and ultimately unanswerable.

The public right to know the details of a confession that may ultimately be judicially determined to have been unconstitutionally obtained seems to me to be outweighed by the defendant's right to a fair trial, particularly where the defendant is 13 years old.

LUPIANO, J. (concurring). I concur in the rationale set forth in the majority opinion of Justice SULLIVAN and add the following observations: First, in *Matter of United Press Assns. v Valente* (308 NY 71, 77), the Court of Appeals declared that "[t]he courts have ever been alert to strike down any infringement or limitation upon the fundamental right of the press freely to publish and distribute news and comments [citations], and we certainly have no disposition or purpose to undermine or minimize it. That right has, however, never been held to confer upon the press a constitutionally protected right of access to sources of information not available to others. Judicial proceedings are viewed as 'a public event', in the sense that 'Those who see and hear what transpired can report it with impunity.' [citation.] But freedom of the press is in no way abridged by an exclusionary ruling which denies to the public generally, including newspapermen, the opportunity to 'see and hear what transpired'." Second, the broad holding of *United Press (supra)* has not been departed from (see *Matter of Oliver v Postel,* 30 NY2d 171, 179). Third, acknowledgment of the critical importance of harmonizing the First Amendment's guarantee of free press and the Sixth Amendment's guarantee of fair trial prompted the organization of the Fair Trial Press Conference in 1969. The conference guidelines recognize that " '[a]ll concerned should be aware of the dangers of prejudice in making pretrial disclosure' " and go on to state that " '[t]he public disclosure of [certain matters] * * * may be highly prejudicial without any significant addition to the public's need to be informed' " (see *Matter of Oliver v Postel, supra,* p 181, n 3). Fourth, *"Public trials, of necessity, serve a twofold purpose. They safeguard an accused's right to be dealt with fairly* and not to be unjustly condemned *(Estes v. Texas,* 381 U. S. 532, 539; 1 Cooley, Constitutional Limitations [8th ed], p. 647) and concomitantly, serve to instill a sense of public trust in our judicial process by preventing the abuses of secret tribunals as exemplified by the Inquisition, Star Chamber and *lettre de cachet* [citations]" *(People v Hinton,* 31 NY2d 71, 73; emphasis supplied).

The afore-mentioned enumerated observations impel the conclusion that the instant matter is one requiring scrupulous safeguarding of the defendant's *primary* right to a fair trial. The *limited* closure herein is clearly warranted, and as so aptly remarked by the Court of Appeals in *Matter of Gannett Co. v De Pasquale* (43 NY2d 370, 380): "To allow public disclosure of potentially tainted evidence, which the trial

court has the constitutional obligation to exclude, is to involve the court itself in the illegality. This potential taint of its own process can neither be condoned nor countenanced."

I also would indorse Trial Term's order as a proper exercise of discretion.

SILVERMAN, J. (dissenting). The District Attorney of Bronx County and New York News, Inc., publisher of a daily newspaper, bring these article 78 proceedings in the nature of prohibition against respondent Honorable HOWARD E. BELL, a Justice of the Supreme Court. Justice BELL is presiding in the Supreme Court, Bronx County, in a certain criminal action, including a suppression hearing, in which the defendant, a 13-year-old boy, is charged with murder under the recent juvenile offender statutes (L 1978, ch 481). The petitions seek to prohibit Justice BELL from excluding the press and the public from the pretrial suppression hearings, pursuant to Justice BELL's oral order to that effect. Justice BELL stated, however, that he would permit redacted transcripts of the proceedings during the pretrial proceedings to be made available assuming redaction could be arranged by the District Attorney and the defense attorney.

Justice BELL's direction to close the courtroom was made on application of the defendant and after appropriate notice not only to the District Attorney but to the representatives of the press; and there is only praise by all parties for the Justice's sensitive regard for the procedural regularity of his actions.

The controlling case in the area, to the extent that it is applicable, is *Matter of Gannett Co. v De Pasquale* (43 NY2d 370). In that case, the majority said with respect to a suppression hearing (p 380): "To avoid becoming a link in the chain of prejudicial disclosures, trial courts have the power to exclude the public from pretrial suppression hearings * * * As the locus of public interest, this determination is to rest with the hearing Judge."

"[P]rohibition is available both to restrain an unwarranted assumption of jurisdiction and to prevent a court from exceeding its authorized powers in a proceeding over which it has jurisdiction * * * If * * * appeal or other proceedings would be inadequate to prevent the harm, and prohibition would furnish a more complete and efficacious remedy, it may be used even though other methods of redress are technically available" *(La Rocca v Lane,* 37 NY2d 575, 578-580). The

present case appears to fit within those categories that permit prohibition.

A number of the cases reviewing the closing of courtrooms by a Judge have come up on article 78 proceedings. (*Matter of Gannett Co. v De Pasquale, supra; Matter of Oliver v Postel,* 30 NY2d 171; *Matter of United Press Assns. v Valente,* 302 NY 71.)

None of the parties objects to our assuming jurisdiction in this matter. And the Trial Justice has almost explicitly requested us to do so, saying that he thought the matter should go to the Appellate Division, and staying the proceedings before him pending these proceedings. In the circumstances, it is appropriate for us to accept jurisdiction at this stage of the proceedings with respect to the particular order here sought to be reviewed.

As to the merits: We are of course bound by the decision of the Court of Appeals in *Matter of Gannett Co. v De Pasquale* (43 NY2d 370, *supra*). The majority of the court said (p 380): "At the point where press commentary on those hearings would threaten the impaneling of a constitutionally impartial jury in the county of venue, pretrial evidentiary hearings in this State are presumptively to be closed to the public. * * * Of primary consideration is the public's interest in avoiding any developments that would threaten to truncate a defendant's right to a fair trial." Thus, in the tension between the public's right to know what goes on in its courts and the public's interest to avoid any developments that would threaten the defendant's right to a fair trial, substantial doubts are to be resolved in favor of protecting the fair trial.

But this is not to say that the long-standing tradition of open public hearings is to be accorded no weight. The court said (p 381) that the magnitude of any genuine public interest "may be found to outweigh the risks of premature disclosure." Thus a balancing of the conflicting considerations is still required.

Public knowledge of what transpires at suppression hearings is an important value. It adds to public understanding of why confessions and other important evidence are or are not suppressed by the courts, whether or not the evidence is reliable. And such public knowledge casts light on the conduct of police, prosecuting authorities and defense in the early stages of criminal cases. (See Comment, The Right to Attend Criminal Hearings, 78 Col L Rev 1308, 1310-1311.) And the

public has a right to know how the new juvenile offender statutes are working in practice, including the applicability of suppression issues to cases where the defendant is 13 years old.

Against these considerations is the risk that evidence—here apparently confessions—which ultimately may be suppressed will still come to the attention of prospective jurors through widespread publicity as to proceedings on the suppression hearing.

Applying the balancing test prescribed by the *Gannett* case, we do not think that the risk of prejudicing the defendant's right to a fair trial is great enough to warrant closing the courtroom in the present case.

The *Gannett* case involved a trial in Seneca County with a population of 36,000 people; a murder of a prominent citizen and public official; and proceedings which had been the subject of intensive, prolonged and pervasive publicity.

In the case at bar, the county is Bronx County with a population of approximately 1½ million; the crime is unfortunately not an uncommon one in the City of New York or in Bronx County—robbery and a murder in the course of the robbery. The crime is alleged to have taken place in the subway, and at the moment subway crime is receiving increased publicity. Neither the defendant nor the victim is a prominent public figure; there is nothing to indicate that either one of them is widely known.

All that distinguishes this case from many other such cases is that this is said to be the first prosecution of a 13-year-old for murder in the felony courts under the new juvenile offender law. And even that is probably no longer true. We read in the newspapers that there are other such prosecutions in progress; this court had another such case on its calendar a week after this one.

We have examined the publicity in this case. It is not nearly comparable in scope with that in the *Gannett* case. Indeed, the Trial Justice recognized this fact, saying:

"I will concede or agree with you there hasn't been that much publicity with respect to this case. We haven't had the glaring headlines that you would receive in certain cases.

"My concern, for instance, if we were in the process of selecting a jury today, there's no question in my mind that we could obtain a jury. I'm only anticipating, I'm not concerned

about that. I'm anticipating now, this is what bothers me mostly. I don't know what the press is going to do tomorrow or this afternoon".

All of us on this bench have sat as Trial Judges in criminal cases in the City of New York. And we must all have been struck by the fact that even in cases where there has been very widespread publicity, many prospective jurors have never heard of the case. Indeed, it has been commented that in the famous Watergate cases an astonishing number of prospective jurors said that they had never heard of the case. Compare *State v Joyce* (160 NJ Super 419), where in a county with a population of 320,000, after almost daily newspaper, television and radio reports of a pretrial suppression hearing, in a case involving alleged misconduct in office, perjury, etc., by well-known local political figures, only 3 of 102 prospective jurors stated they had read or heard of the case.

On the present record, we, like the Trial Justice, have only our own experience to go on. In this case, with its characteristics and the present and reasonably foreseeable level of publicity, we doubt that more than a small percentage of prospective jurors will even have heard of the case. We do not believe that opening the suppression hearings will significantly increase the difficulties of obtaining an impartial jury—especially if a week or two were allowed to elapse between the close of the suppression hearings and the commencement of jury selection.

Any prediction of course is subject to error. But in our judgment the risk of prejudicing the trial is sufficiently minor so that we think the courtroom should not be closed. If the present state of facts requires closing the courtroom during the suppression hearing, we fear that it would be necessary to close the courtroom in a high percentage of suppression hearings in cases where there is any publicity at all.

Our dissent is not based on the view that other remedies are available. As the Court of Appeals said in the *Gannett* case (43 NY2d 370, 380, *supra*): "Continuance, excessive *voir dire* examinations, limiting instructions or venue changes may prove paltry protection for precious rights". And the practical difficulties of these palliatives in themselves are serious hindrances to the administration of justice. Our dissent is based simply on our view that the risk that press commentary on these hearings will threaten the impaneling of a constitution-

ally impartial jury in this case is not great enough to warrant closing the courtroom.

We do not mean to limit the power of the Justice presiding at the hearing or the trial to take appropriate future action, including closing the courtroom, as the case and the publicity concerning it develop. We only say that at this stage, the hearing should not be closed.

We would grant the petitions and direct judgment under article 78 directing respondent not to close the courtroom during the suppression hearing, without prejudice to the power of respondent, or his successor at a suppression hearing or trial, to close the courtroom, if, in his judgment, circumstances as they develop require or warrant such closure.

SANDLER, J. P., and LUPIANO, J., concur with SULLIVAN, J., in separate opinions; SILVERMAN and ROSS JJ., dissent in an opinion by SILVERMAN, J.

Applications for orders in the nature of writs of prohibition and mandamus denied and the petitions dismissed, without costs and without disbursements.