Fuchsberg, J.
(concurring). I agree that the closure order
should be invalidated. However, I depart from the majority in its refusal to ground our decision at least in part upon First Amendment principles and instead rely on what I view as artificial distinctions between various kinds of pretrial proceedings. As I see it, the decision today leaves us in the position of having to set forth discrete rules for every type of judicial proceeding in which the exercise of judicial discretion leads to a restriction on public access. The consequence is to leave Trial Judges and litigants at sea and without a clear beacon from which to chart their course through the cross currents of this recurring problem.
Moreover, as a practical matter, I am not convinced that the standards established by today’s decision afford adequate protection to the public’s right of access to judicial proceedings. By leaving the interest in open court proceedings without constitutional support, it is made subservient to the dominant, even if not exclusive, role of the Sixth Amendment. The result may very well be a whittling away of the right of public access. Indeed, according to the latest available statistics, from the date of the Supreme Court’s decision in Gannett Co. v De Pasquale (443 US 368, 99 S Ct 2898), July 2, 1979, until the beginning of October, 1979, closure motions were made in the course of 75 criminal proceedings across the Nation and in 44 of those cases the closures were enforced or upheld on appeal (Reporters Committee for Freedom of the Press, Washington, DC; see, also, New York Times, Oct. 13, 1979, p 21, col 1). Nor were the closures confined to suppression hearings. They extended to other pretrial proceedings, such as probable cause hearings and voir dire (see Rapid City Journal Co. v Circuit Ct., 283 NW2d 563 [SD]) as well, for instance, as posttrial proceedings relating to sentencing (but see United States v Fiumara, 605 F2d 116). More ominous still is the fact that, in several cases, the trial itself was closed (see Richmond Newspapers v Commonwealth of Virginia, — Va — [Va Supreme Ct, July 9, 1979], cert granted 444 US 896). There is, therefore, an urgent need for a firm guarantee of openness in criminal proceedings.
At this point, I also pause to note that, although the *449 Supreme Court’s Gannett decision held that the right to invoke the Sixth Amendment’s public trial guarantee belonged primarily to a defendant in a criminal proceeding (443 US 368, 99 S Ct 2898, 2905-2911, affg 43 NY2d 370), that decision does not compel the conclusion that First Amendment interests are irrelevant to our considerations in this case. Rather, in essence, Gannett did no more than carefully skirt the First Amendment issue.
Delivering the opinion of the court in Gannett, Justice Stewart, far from writing off the First Amendment, simply stated, "even assuming, arguendo, that the First and Fourteenth Amendments may guarantee such access in some situations, a question we do not decide, this putative right was given all appropriate deference” (443 US 368,99 S Ct, at p 2912). Though Chief Justice Berger wrote separately to emphasize that a pretrial rather than a trial proceeding was involved (443 US 368, 99 S Ct, at p 2913), he too joined in this opinion. Indeed, the only opinions to directly address the First Amendment question were the separate concurrences of Justices Powell and Rehnquist, who came to antithetical positions. Justice Powell not only indicated that the public and the press did possess a protected First Amendment interest, but made the point that it had been adequately respected at the trial level (443 US 368, 99 S Ct, at pp 2914-2917); contrariwise, Justice Rehnquist took the occasion to opine that the court had "repeatedly * * * held that there is no First Amendment right of access in the public or the press to judicial or other governmental proceedings” (443 US 368, 99 S Ct, at p 2918). Finally, the four dissenting Justices, in an opinion by Justice Blackmun, elected to meet the plurality squarely on its Sixth Amendment grounds alone; but, while they briefly acknowledged that the court had not previously based its determinations of disputes over access to governmental information on the First Amendment, the dissenters apparently did not view the case an appropriate vehicle for the exploration of the more untracked terrain in which both First and Sixth Amendment interests can be said to reside (443 US 368, 99 S Ct, at p 2919).
On this box score — one Justice for reliance on the First Amendment, one Justice against such reliance and seven varyingly noncommittal — the decision furnishes little, if any, guidance on the role the First Amendment should play in the present case. It certainly does not warrant abdication of our *450 own responsibilities in an area that is not only as important but as unsettled as this one (see, e.g., NY Const, art I, § 8; Civil Rights Law, § 12; CPL 30.20, subd 1; Judiciary Law, § 4).
For that matter, what I here make express, I deem implicit in the majority’s own position. Since the defendant himself willingly waived the right to be tried publicly, I would read the caution that the majority here counsels Trial Judges to employ as itself denoting a great reluctance to tread upon the prerogatives of the public and the press as observers in a judicial proceeding. More directly stated, because the "right to know” about the content as well as the conduct of such proceedings looms so large in the scheme of the rights essential for self-government in a democracy, it is deserving of constitutional recognition under the First Amendment (see Meiklejohn, Free Speech and Its Relation to Self-Government, p 26; Note, Trial Secrecy and the First Amendment Right of Public Access to Judicial Proceedings, 91 Harv L Rev 1899).
Time and again it has been said that public scrutiny of the functioning of the courts, as with that of the legislative and the executive branches of our governments, serves as an effective means of insuring that Judges and prosecutors — officials invested with the public’s trust — perform responsibly and not arbitrarily (Sheppard v Maxwell, 384 US 333, 350; see Cox Broadcasting Corp. v Cohn, 420 US 469, 492; Mills v Alabama, 384 US 214, 218-219). To this end, it has been emphasized that "[a] trial is a public event. What transpires in the court room is public property * * * There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it” (Craig v Harney, 331 US 367, 374).
But, apart from this, the openness of a judicial proceeding, especially a criminal one, is itself valuable in reinforcing the integrity of our system of justice and maintaining public confidence in its institutions. As we noted only recently, "the concept of a secret trial is anathema to the social and political philosophy which motivates our society” (People v Jones, 47 NY2d 409, 413, cert den 439 US 846; see Matter of Oliver, 333 US 257, 268). And, access to the processes by which justice is dispensed tends to facilitate public education about those processes themselves as well as about the vital issues that they often address. Indeed, perhaps more apt today than ever before is De Tocqueville’s observation that "hardly a political *451 question in the United States * * * does not sooner or later turn into a judicial one” (De Tocqueville, Democracy in America [Mayer ed, Lawrence trans, 1969], ch 8, p 270).
This said, it cannot be doubted that the press performs the key role in disseminating to the public information about the judicial process. Because the "man in the street” generally has neither the time nor the inclination to attend trials much less pretrial proceedings, which, because of the prevalence of plea bargaining, most often turn out to be the only judicial proceedings that take place in criminal cases, it falls to the press to furnish the information that the citizen needs to intelligently discharge his civic obligations. For, citizen awareness of the functioning of governmental institutions — one of the prime underpinnings of the First Amendment — depends as a practical matter on the prospect of an inquiring press for its continued validity (Cox Broadcasting Corp. v Cohn, 420 US 469, 491, supra; United States v Cianfrani, 573 F2d 835, 862 [Gibbons, J., concurring]; Note, Right to Attend Criminal Hearings, 78 Col L Rev 1308, 1319).[1]
That this First Amendment interest was infringed in the case before us cannot be questioned. In the first place, unlike Gannett, it cannot be argued that no timely objection to the closure of the pretrial hearing was lodged by a representative of the public (see Gannett Co. v De Pasquale, 443 US 368, 99 S Ct 2898, 2912, 2918-2919, supra). Here, members of the press promptly made known their opposition to the Judge’s ruling excluding the public from the competency proceeding.
More importantly, no colorable claim can be made that the competency proceeding required under CPL article 730, because it was not a "trial”, reflected no matter of public interest.[2] While judicial proceedings admittedly "are not like *452 elections, to be won through the use of the meeting-hall, the radio, and the newspaper” (Bridges v California, 314 US 252, 271), it is no less true that the community’s interest in this defendant’s case could easily have been transformed into suspicion and even distrust of the criminal justice process had the decision rendered behind closed doors been one of incompetency to stand trial (cf. Note, 91 Harv L Rev 1899, 1907-1908). Far beyond this, the public was certainly entitled to know firsthand where and how our legal system draws the line between competency and incompetency. Moreover, if a trial had resulted, the testimony adduced at the CPL article 730 hearing would likely bear critically on the defense of insanity. For example, the testimony of medical and psychiatric experts might be relevant in the not unusual circumstance of a defendant whose insanity plea is based on the same or similar mental defect that furnished the grounds for his alleged incompetency. Insofar as the evidence relating to incompetency and insanity overlap, the "right to know” thus subsumes more than merely the ability to obtain information; on a more fundamental level, it carries implications for public confidence in and respect, for the institutions that define the concepts of "guilt” and "innocence”.
Nor was the closure order any less of an infringement on constitutionally protected interests because it took the form of a denial of access rather than a ban on the communicating of information already known, presumptively invalid as a prior restraint (see, generally, New York Times Co. v United States, 403 US 713, 714). The First Amendment respects the right of citizens to enjoy the free flow of information and ideas, a right which necessarily encompasses the correlative rights to receive and to communicate (see Virginia Pharmacy Bd. v Virginia Consumer Council, 425 US 748, 764-765; cf. People v Remeny, 40 NY2d 527, 533 [concurring opn]). Obviously, without the means to acquire information, the constant stream of thought and discourse may be slowed to an intermittent trickle. Especially is this so where the source has been one historically open to public probing, for its damming up then *453 becomes tantamount to a restriction on both the gathering and the communicating of information.
All of this, of course, is not to say that, waving the banner of the First Amendment, we should ride roughshod over the defendant’s right to a fair trial.[3] In the overwhelming majority of criminal proceedings no serious threat of prejudice will appear; in fewer cases still will the prejudice threaten to be of unmanageable dimensions. In those rare instances in which the First and Sixth Amendment interests compete head-on, an accommodation must be reached. However, because "[fjreedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice” (Pennekamp v Florida, 328 US 331, 347), I would strike the balance only when the probability of ineradicable prejudice remains after an exhaustive consideration of the alternatives to closure.
Among such less restrictive alternatives that may commonly be employed by the Trial Judge are changes of venue or venire, continuances, extensive voir dire and cautionary instructions (see Matter of Gannett Co. v De Pasquale, 43 NY2d 370, 382, 387, supra [Cooke and Fuchsberg, JJ., dissenting]; Nebraska Press Assn. v Stuart, 427 US 539, 563). In this case, the record discloses no such probing examination of any option other than the most extreme, that of closure. And, even were the circumstances of such an order of magnitude as to justify excluding the public and the press from the pretrial hearing, certainly nothing excused the continuing unavailability of the hearing transcript once the defendant had pleaded guilty.
I therefore join with my colleagues in the result. But I do not do so without emphasizing that the rationales on which our respective votes proceed are crucial for what they portend for First Amendment rights. For this is a case in which the reasoning may be more important than the result.
Judges Jasen, Jones and Meyer concur with Judge Wachtler; Chief Judge Cooke and Judge Fuchsberg concur in separate concurring opinions; Judge Gabrielli taking no part.
*454 Appeal dismissed, without costs, upon the ground that no substantial constitutional question is directly involved. Oral application for leave to appeal granted. Judgment reversed, with costs, and the petition granted to the extent of directing the release of the transcripts of the competency hearing.

. Viewing the press as the agent of the public in these matters does not, as a consequence, entail recognizing a special right of access for the media when the general public has no such right. Supreme Court decisions have refused to interpret the First Amendment to permit the press greater access than is the public’s entitlement (see Houchins v KQED, Inc., 438 US 1, 11-12; Saxbe v Washington Post Co., 417 US 843, 850; Pell v Procunier, 417 US 817, 834 ["newsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public”]).

. Looked at in terms of the deprivation of information occasioned by the closure, the pretrial suppression hearing in Gannett from which the public was permissibly excluded certainly had no less an effect. Nor am I persuaded that pretrial competency hearings may not present the same dangers to a defendant’s Sixth Amendment rights as do suppression hearings. Certainly, at least in terms of impact on the community from which potential jurors will be drawn, an unsuccessful claim of incompetency to *452 stand trial might well be interpreted, rightly or wrongly, as a desperate attempt by the defendant to avoid a trial on the merits and a signal that a subsequent insanity defense, especially one that relies on proof of the same nature, should be similarly discredited. In contrast, most suppression hearings are unlikely to generate the kind of sensationalism that would seriously prejudice a defendant’s fair trial right. In short, it should not be the category of the pretrial proceeding, but instead, the facts and circumstances in the particular case that are determinative.

. Rather, there not only are obvious limitations on access to the judicial process, as witness the exclusion of the public from the deliberations of Judges and juries, but restrictions may also be imposed, when circumstances warrant, in such matters as those within the purview of section 4 of the Judiciary Law (People v Jelke, 308 NY 56) and, when appropriate, during the testimony of undercover police personnel (People v Hinton, 31 NY2d 71).